William COUSINS, Jr., et al., Plaintiffs,

v.

CITY COUNCIL OF the CITY OF CHICAGO et al., Defendants.

No. 70 C 3202.

United States District Court, N. D. Illinois, E. D.

July 11, 1973.

Aram Hartunian, Michael L. Shakman, Robert Plotkin, Chicago, Ill., for plaintiffs.

Earl Neal, Ed Harfield, Corp. Counsels, Chicago, Ill., for defendants.

## DECISION and ORDER

McMILLEN, District Judge.

This cause came on to be partially re-tried pursuant to a decision of the Court of Appeals entered May 25, 1972. 466 F.2d 830 (7th Circuit). The controversy involves the allegedly discriminatory nature of the defendant's 1970 Ward map which was adopted by the City Council on November 6, 1970, pursuant to the Court of Appeals order in Skolnick v. Mayor and City Council of Chicago et al., 415 F.2d 1291 (7th Cir. 1969), cert. den., 397 U.S. 954, 90 S.Ct. 984, 25 L.Ed.2d 138 (1970). Plaintiffs attacked that map on several grounds, but it was upheld by the trial court and an election was held in which all of the plaintiff aldermen who ran for re-election were successful. The Court of Appeals, however, sent the case back for the re-examination of the discrimination issue by means of a re-trial.

Evidence was received in the form of a pre-trial stipulation, testimony in open court, certain portions of testimony given at the original trial, depositions and numerous exhibits. Very little new evidence was produced but much of the earlier evidence was shortened. We thus find ourselves in the rather unusual position of deciding substantially the same issues as have already been decided by

the trial court, on substantially the same evidence.

Both parties have submitted post-trial arguments in written form, and the court considers itself fully advised in the premises. We find and conclude that the plaintiffs are entitled to but a portion of the relief prayed for in their Complaint, specifically a revision of the Seventh and perhaps the Eighth Wards as constituted in the 1970 map.

The first dispute between the parties is exactly what the re-trial was intended to consist of. The Court of Appeals defined this at 466 F.2d 838 and 843 as follows:

> . . . Although we are not prepared to measure, on this record, any discriminatory effect which may have resulted, we think that the findings must be set aside until the question has been more fully explored in the district court (p. 838).

> . . . we are unable to say that plaintiffs' evidence so clearly established that the ward boundaries were the product of purposeful discrimination as to permit this court so to find. If the litigation concerned ordinary interests of the plaintiffs alone, we might well conclude that they must bear the burden of failure to establish more clearly all elements of their case. We are of the opinion, however, that the type of rights involved here requires special care that claims of impairment be thoroughly inquired into. (p. 843).

The test of discrimination which the Court of Appeals intended us to apply is stated at 466 F.2d at 843 as follows:

> . . . There is no principle which requires a minority racial or ethnic group to have any particular voting strength reflected in the council. The principle is that such strength must not be purposefully minimized on account of their race or ethnic origin.

The next question is the standard of proof which must be met by the plaintiffs to entitle them to relief. As indicated in the first passage quoted above

from 466 F.2d at 843, the Court of Appeals was searching for evidence which "clearly" established purposeful discrimination. Although this standard was merely stated for review purposes, there is no indication by the Court of Appeals that plaintiffs' burden on re-trial is any less, nor that they must prove invalidity beyond a reasonable doubt, as was required in Vale v. Gary National Bank, 406 F.2d 39 (7th Cir. 1969).

■ Since the plaintiffs seek to set aside a City ordinance on constitutional grounds, we believe that the usual requirement of clear and convincing proof applies in this case. See e. g., Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S. Ct. 844, 25 L.Ed.2d 174 (1970); Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). The Court of Appeals seems to have adopted this standard, because at p. 843 it found that plaintiffs had "clearly established" that the location of predominantly black and Puerto Rican areas was considered in the preparation of the new ward boundaries. At another point the Court of Appeals found it "clear" that the Bell-student map had a serious and substantial purpose for the benefit of the City (466 F.2d at 837).

■ Finally, these and other findings made by the Court of Appeals are the law of this case and are binding, particularly since the evidence on re-trial is substantially the same as on the first trial. Plaintiffs have argued that the wards drawn by the City Council lack "compactness" and should be set aside for this reason alone. We believe this was in effect concluded as a separate issue when the Court of Appeals said, with respect to the 1970 map:

> In considering the plaintiffs' claim, founded on state law, that the wards are not compact, we look for guidance to the Supreme Court of Illinois. In dealing with a requirement that senatorial districts be formed of compact territory, it has said: "There is a vast difference between determining whether the principle of compactness

of territory has been applied at all or not, and whether or not the nearest practical approximation to perfect compactness has been attained. The first is a question which the courts may finally determine; the latter is for the legislature." Notwithstanding the irregularities in outline of wards, we could not determine from the present record, if it were our place to do so, that the principle of compactness was not applied at all.

Nonetheless, it is our view that when other facts point to a probability that there has been invidious discrimination in drawing ward lines, deviations from maximum compactness may be considered along with these other facts in determining whether such discrimination (violating federal rights) has occurred. (466 F.2d at 833–834).

Turning to the facts, the Bell-student map has been found by the Court of Appeals to be a "trial run" for the task later performed at the public hearings. The question thus arises whether this trial run was itself discriminatory. The three students testified that Bell engineered the details of that project and that Alderman Keane and others participated indirectly by commenting from time to time on the composition of certain wards. The question of "race" was discussed many times, but the plaintiffs offered no evidence of the contents of these particular discussions. No student testified that any statement was made during this "trial run" tending to induce discrimination or gerrymandering against any particular group and Bell did not testify.

Hence the validity of the "student map" must be determined from circumstantial evidence. This appears in two forms (a) statements of those who made suggestions or requests about specific wards during the student project, and (b) the end product, particularly to the extent reflected in the map adopted by the City Council.

Alderman Keane, in whose law library the students worked, had represented

the 31st Ward for many years. It can be assumed that he wanted this ward to remain in substantially the same shape and location as before, a political consideration of the type which the Court of Appeals specifically excludes from consideration (466 F.2d at 844). See also Gaffney v. Cummings et al., 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Bell resisted the inclusion of additional blacks or Puerto Ricans in the new ward by keeping it as far west as feasible. We believe this was presumably in accordance with Keane's wish. The ward ended up with 25% Puerto Ricans and 1.4% blacks. Had its boundaries been moved east or north, to include more blacks or Puerto Ricans, the dominant majority still would have remained overwhelmingly as before. We find and conclude that the considerations for the shape and boundaries of the 31st Ward were primarily political and that the failure to include certain areas of blacks or Puerto Ricans caused them no discernible loss of voting strength.

Alderman Wigoda, who was one of Keane's law partners and had ready access to the law library, represented the 49th Ward. He wanted a certain precinct included which had been preliminarily excluded by the Bell-student draft. His desire was complied with, a small black area was moved out, and his ward remained 95% white. Had the original student draft been adopted, the 49th Ward would still have been overwhelmingly white. A similar change was made at the request of an unnamed alderman from the northwest sector of the City which is predominantly white, as shown by Plaintiffs' Ex. A–2. Thus these decisions were obviously political, not discriminatory.

Alderman Keane also told the students that Aldermen Burke and Sheridan should not be drawn out of their wards or be put in a situation where they could not be re-elected, since they were bright young men such as were needed in the City Council. Sheridan had represented the 16th Ward, but the new map put him in the 15th Ward. The 16th Ward

contained a 95% black majority in the final product and a black alderman was elected. Sheridan ran in the 15th Ward which was 91% white, but was defeated by another white. Burke had represented the 14th Ward which has a white majority of 93% in the new map, but he did not run for re-election. The logical conclusion to be drawn from the colloquy and changes with respect to the 14th and 16th Wards is that political considerations, not discrimination, was the motivation, and no discrimination against blacks or Puerto Ricans was shown to result.

Finally, Alderman Despres' 5th Ward was discussed in the presence of the students. It remained a black ward by 57.-5%, but the white plaintiff alderman was re-elected. He may have a justified complaint that his ward was made increasingly black in an effort to unseat him, but this does not constitute discrimination in the sense defined by the Court of Appeals as quoted above (p. 532).

The purpose of the Bell-student map as a trial run could have been either to help Alderman Keane produce a discriminatory result or to help him with the mechanics of drawing a map which complied with the one-man one-vote mandate of the Court of Appeals in Skolnick v. Mayor and City Council of Chicago, et al. (supra p. 531). We have found no substantial evidence that the student map was intentionally discriminatory, and clearly the students did not so intend. It follows that the map was no more than a trial run for a new and difficult procedure which had never before been attempted.

Inasmuch as Alderman Keane did follow substantially the same procedure in building up the final map in the public hearings as his aide Bell had followed with the students, the results could be expected to be similar. The students' product could not be copied for the final product, however, because they worked from incomplete and inaccurate census figures, whereas the City Council's subcommittee had more correct and detailed versions. (Neither group, incidentally, had any census breakdown by race or national origin). Furthermore, in the course of the public hearings, additional individual aldermen's wishes were accommodated by adjusting boundaries from time to time. Finally, the sequence in which the areas were worked on varied from the trial run, so that the ultimate fitting of the pieces together necessarily gave a different end result.

Besides the specific wards already referred to in connection with the Bell-student map, plaintiffs also introduced the prior testimony of Alderman Hoellen who had long represented the 47th Ward. When this Ward was first redrawn by the City Council's subcommittee, Hoellen found that the boundaries had been drastically changed so that, in his opinion, a Republican could not be elected in it and furthermore that Hoellen himself lived south of its boundary. He protested violently to everyone within earshot, and he even enlisted the support of Democrats in the northerly wards who were affected by this preliminary version—specifically Simon of the 40th, O'Rourke of the 48th, and even Wigoda of the 49th. Keane thereupon referred the matter to Lewis W. Hill who, as Commissioner of the Department of Development and Planning, had possession of all of the census figures and was in charge, mechanically, of drawing various maps for the subcommittee. The problem was worked out to the extent that all of the affected aldermen were satisfied and voted for the final map, but the controversy over the North and Northwest wards did not involve blacks or Puerto Ricans to any extent. All of these wards were and remained overwhelmingly white, and no map produced by the plaintiffs suggest any change in these wards which would affect these proportions.

Another specific situation concerning which the plaintiffs introduced evidence was plaintiff Alderman Cousins' 8th and Alderman Bohling's 7th. The Seventh had a 55–60% majority of blacks before the ordinance. The Bell-student map re-

duced the blacks to 29.4% and the final product resulted in 26.9% blacks. Some of the blacks who had formerly been represented by Alderman Bohling, a white, were moved to the adjacent 8th Ward, represented by the plaintiff Cousins, a black. He now represents a ward consisting of 77.8% blacks. This is one instance where the intention to maintain the political *status quo* was subordinate to the intent to obtain a white majority in the 7th Ward. The evidence on this point is almost entirely circumstantial, but it is sufficiently clear and convincing.

With this one exception, plaintiffs did not prove any specific acts of discrimination against blacks. There is no evidence of invidious discrimination with respect to the 18th Ward, the shape of which apparently caught the attention of the Court of Appeals (466 F.2d at p. 839–840). Furthermore, no black alderman or ward with a black majority was replaced by a white counterpart, nor was any white alderman retained or enabled to be elected by dissipating a previous black majority in any ward or definable area.

In fact, fourteen black aldermen were elected from the new wards, whereas only ten had been elected on the basis of the preexisting map. The final 1970 census figures show that black comprise 32.7% of the City's population, and the parties have stipulated that 15 wards or 30% contain a majority of blacks. If the new map were to contain 16 wards with black majorities, this would constitute 32% of the census population. These small differentials do not constitute circumstantial evidence of invidious or generalized discrimination.

Plaintiffs base an alternative argument on statistics and probabilities. The statistical argument begins with plaintiffs' term "border wards". These are wards which straddle black and white areas, but are further defined by plaintiffs to exclude wards which could not be drawn to contain a different white or black majority than in the 1970 map. This refinement eliminates six

wards, four of which are black. Thus plaintiffs by their limited definition pick out 15 "swing" wards which could be drawn to contain a majority from either race. Only four of these 15 wards have black majorities, from which plaintiffs produced expert testimony that a 50–50 probability was converted into a 1 out of 17 probability.

This argument does not prove discrimination for several reasons. Many factors could properly be considered in drawing the map, according to the Supreme Court and the Court of Appeals decisions already alluded to. Such factors include compactness, contiguity, geographical and other physical characteristics, and politics. Furthermore the probability argument ignores the fact that the black and white areas are not sharply defined even in the "border" areas but graduate from black to white in varying degrees, as shown in Plaintiffs' Ex. A–2. The 50–50 probability would be valid, if at all, only if there were a sharp dividing line between black and whites and *no* other facts are involved.

Plaintiffs adopted the Court of Appeals' suggestion (466 F.2d at 843) and introduced a map made up of compact, contiguous wards of equal population. This map was constructed by the plaintiff's witness Reuben Singer and contained sixteen wards with black majorities. Thirteen of these wards are defined by plaintiffs as "border wards", and six of these contain black majorities. There is no evidence of the probabilities of six out of thirteen coming out black, but we do not believe that probabilities constitute clear and convincing proof of discrimination against blacks, particularly when limited to the particular type of "border wards" as defined by the plaintiffs.

On the other hand, the Singer map tends to prove that the City Council did not discriminate when it produced a map with 15 instead of 16 wards with black majorities. If Alderman Keane or the City Council had tried to discriminate (a risky venture when complying with a

Court of Appeals order), they could have produced a map with considerably less than 15 wards containing black majorities. They could conceivably have gerrymandered most of the blacks in the "border wards" into wards with white majorities and ended up with a relatively few solid black wards in the inner city and near west side. But no way has been suggested how the City Council could have created more than 16 wards with a black majority in a city containing 32.7% blacks, many of whom are scattered through white areas which must necessarily constitute white wards.

This statistical impasse renders the plaintiffs' case with respect to Puerto Ricans almost moot. The census figures which became available after the map was drawn showed only 49,500 persons in this category, not more than half of whom would be adults eligible to vote. A proper ward under the 1970 census figures was designed to contain 66,582 persons, give or take ½% (although the Supreme Court would now apparently tolerate considerably more deviation under the *Gaffney* decision, supra p. 533, and its companion White et al. v. Regester et al., 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)). Plaintiffs' Exhibit KK–2 demonstrates that these Puerto Ricans are scattered over a population area which must consist of at least three and perhaps four wards. Hence there is no theory by which they could constitute a majority in any single ward. There is also practically no direct evidence of any special attention being given to this minority group, with the exception of the 31st Ward boundary, and this evidence does not constitute clear or convincing proof that its voting strength was minimized in any significant way.

Plaintiffs attempted to shift their proof from the Latin-American minority alleged in the Complaint to the "Spanish-language" minority which is now designated in the census figures. However, they did not attempt to amend their complaint nor to add a plaintiff who represents this group as distinguished from Latin Americans. Furthermore the evidence concerning the Spanish language group reveals that, although totalling about 80,000 persons, it contains an unknown number of aliens, and it is so scattered as to constitute a minority in any ward, unless perhaps a special ward were to be drawn to accommodate this group. This is not necessary to satisfy the Court of Appeals' test quoted on page 532, above. Cf. Ferrell et al. v. State of Oklahoma et al., 339 F. Supp. 73 (W.D.Okla.1972); aff'd Ferrell v. Hall, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972). We find and conclude that plaintiffs' evidence concerning the Spanish-language group is not relevant to the pleadings or to the Court of Appeals mandate and in any event fails to prove any grounds for relief.

■ ■ Plaintiffs' solution to the alleged discrimination is to throw out the entire 1970 map and start anew, in court. This goes too far, under our findings. The City Council's 1970 map complies fully with equality of representation (one-man, one-vote) and, generally, with compactness and other valid objectives. Only one ward, the 7th, has been shown to have been drawn to intentionally create a white majority where a black majority had previously existed, and most of the excluded blacks were apparently moved into the 8th Ward. Plaintiffs' other contentions are concerned either with boundaries made for justifiable reasons or which did not change the voting strength of any minority group represented by plaintiffs to any significant degree. Therefore plaintiffs should now suggest a solution to the 7th Ward boundaries which will not result in invidious discrimination and will not change the racial majority of the other wards which we have found to be valid.

The defendants should also present their own suggestion for this area, particularly since a new map for the 1975 elections is now in the process of being drawn. We also see no reason why some sort of proportional representation could

not be adopted for the 7th Ward, if necessary, although this point has not been argued (cf. White et al. v. Regester et al., supra p. 536; Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)). Finally, if it appears that the solution might change the representation in all or part of the 7th Ward, a special election may be necessary.