Warren DONOHUE, Sandra Weissman, Valda Bramwell, Roy G. Vanasco, John T. Stewart, Nicholas A. Long, Lyndon LaRouche, the Rockland County Conservative Party, and the Labor Party, Plaintiffs,

v.

BOARD OF ELECTIONS OF the STATE OF NEW YORK, Board of Elections of the City of New York, Secretary of the State of New York, Betty Dolan, and Hugh Carey, Defendants.

No. 76 C 2142.

United States District Court,
E. D. New York.

Dec. 7, 1976.

David S. Heller, New York City, Heller, Kleinman, Wray, Wagner & Tabakman, New City, N. Y., for plaintiffs; David M. Wagner, New City, N. Y., of counsel.

W. Bernard Richland, Corp. Counsel for the City of New York, New York City, for defendant Bd. of Elections for the City of New York; Mark Schwartz, of counsel.

David E. Blabey, Sp. Counsel, New York City, Edward R. Patrick, Deputy Counsel, Albany, N. Y., for defendant New York State Bd. of Elections.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants Hon. Hugh Carey, Governor of the State of New York, and the Secretary of State of the State of New York; A. Seth Greenwald, New York City, of counsel.

Memorandum of Decision and Order

MISHLER, Chief Judge.

Plaintiffs, who include Republican and Conservative Party supporters of President Ford, and members of the Labor Party, bring this action pursuant to 42 U.S.C. §§ 1983, 1985(3) and 1988 [1] seeking an or-

---

1. Title 42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

. . . . .

Section 1985(3) provides for a cause of action:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing. or hindering the constituted authorities of any State or Territory from giving or securing to all person within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully

der: (1) enjoining the Secretary of the State of New York and the Governor from certifying the Democratic Presidential electors; (2) declaring the Presidential election conducted in New York on November 2, 1976, null and void; and (3) directing that a new election be held. Plaintiffs allege that state officials, acting under the color of state law, committed fraudulent acts in the conduct of voter registration and the subsequent general Presidential election which served to deprive them of their constitutionally protected right to vote. Plaintiffs also assert a claim premised upon a violation of the equal protection clause of the fourteenth amendment,[2] arguing that jurisdiction is conferred under 28 U.S.C. § 1331(a). That claim, couched in general terms, is that the ballots cast by legitimate voters were debased and diluted by the illegal votes cast by thousands of unqualified voters.

The plaintiffs charge that officials of the Board of Elections of the City of New York intentionally committed wrongful acts and used improper and slipshod procedures in the administration of the mail registration [3] drive and the conduct of the general Presidential election. The alleged frauds and omissions are said to have resulted in the fraudulent registration of thousands of otherwise ineligible voters, and in turn, the casting of numerous illegal ballots.

Specifically, plaintiffs cite actions taken by Betty Dolan, executive director of the City Board of Elections, which they claim were designed to undermine the processing and verification of close to 300,000 post card registration applications. Plaintiffs allege that Dolan, armed with the knowledge that partisan groups were submitting falsified applications in the names of nonexistent or unqualified voters, withheld close to 180,000 post card applications gathered by the Central Board, forwarding them to the local Boards in Brooklyn, Queens, and the Bronx only two and one-half weeks before the election. Moreover, plaintiffs charge that Dolan, in violation of Election Law § 153, unilaterally extended the deadline for receipt of mail applications.[4] The consequent

---

entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

. . . . .

Title 42 U.S.C. § 1988 in turn provides:
The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish of-fenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

2. Section 1 of the fourteenth amendment to the Constitution provides that:
" . . . No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

3. Election Law § 153, recently enacted in 1975, provides for voter registration by mail. Mail registration procedures were used for the first time in New York in the 1976 elections.

4. Election Law § 153 provides that an individual shall be entitled to vote if his completed application is received by the County Board no later than thirty days before the general election. Plaintiffs claim that Dolan unilaterally decreed that applications received by October 8, 1976, would be deemed valid as long as postmarked by October 4, 1976. This action, they argue, was in direct contravention of the terms of § 153.

surge of late applications is said to have prohibited the transmission of applicant names to computer lists, thus barring their subsequent verification. Dolan, according to plaintiffs, then ordered the preparation of buff cards for all applicants, whether verified or not. The end result, it is argued, was that Board officials indiscriminately sent registration cards to thousands of otherwise ineligible voters, thereby validating their subsequent appearances at polling places and their demands to cast ballots.

Plaintiffs' allegations focus not only on the processing of registration applications, but on the conduct of the election as well. They seek to hold Board officials responsible for the alleged chaos and confusion on election day. Plaintiffs argue that Dolan's public appearance on television and radio shortly before the election, during which she urged people to appear at polling places and promised they would be permitted to vote, fostered chaotic conditions. This, coupled with the election officials' alleged failure to adequately staff voting places, is claimed to have resulted in the casting of thousands of illegal votes. Plaintiffs allege numerous instances where individuals who registered more than once in turn cast several ballots. As well, they charge that votes were recorded under names of persons

who do not exist, mental incompetents and convicted felons.[5]

However, plaintiffs do not claim that the alleged illegal votes were sufficient in number to have changed the outcome of the election. Rather, they assert that the election process was so permeated by fraud that determination of the rightful winner is impossible.

## I.

■ The defendants have moved to dismiss on various grounds. Defendant City Board of Elections, relying on the district court's holding in *Phillips v. Rockefeller*, 321 F.Supp. 516 (S.D.N.Y.), *aff'd*, 435 F.2d 976 (2d Cir. 1970), contends that neither a § 1983 cause of action nor an equal protection claim can be maintained since there is an absence of state action. Defendant's reliance on *Phillips* is misplaced. This is not a case, as in *Phillips*, where certification of the prevailing candidate is pursuant to federal authority.[6] The statutory scheme existing in New York for the election and subsequent certification of Presidential electors, Election Law § 291, expressly provides for certification by the Secretary of State and the Governor's confirming signature.[7] Hence, the ministerial act of certifying the Presidential electors is performed pursuant to state authority.[8]

> The secretary of state shall prepare seven lists, setting forth the names of such electors, and the canvass under the laws of this state of the votes given for each person for whose election any and all votes were given, together with the certificate of determination thereon, by the state board of canvassers; procure to the same the signature of the governor; affix thereto the seal of the state; and, in behalf of the governor, send one of these lists so certified to the administrator of general services of the United States by registered mail and deliver six other lists thus signed and sealed to the president of the college of electors on the first Monday after the second Wednesday in December.

5. Plaintiffs additionally claim that some 50,000 individuals, for whom no buff cards existed at polling places, were permitted to cast paper ballots. Approximately 80 to 90% of such votes were allegedly determined to be invalid.

6. *Phillips v. Rockefeller, supra*, involved the election of a United States senator, and sought to answer the question of whether the seventeenth amendment of the Constitution required the senatorial candidate to receive a majority of the votes cast. Plaintiffs therein sought merely to enjoin the certification of the winner; irregularities in the conduct of the election were not alleged. The district court, pointing to the fact that Election Law § 296 merely required the State to conduct the election for senator, drew upon the fact that certification was pursuant to federal authority, 2 U.S.C. § 1a and 1b, in dismissing the § 1983 cause of action.

7. Election Law § 291 in full, requires that:

8. Moreover, defendant seemingly ignored the tact taken by the Court of Appeals in passing on the substantive question, avoided by the lower court in *Phillips*. The Second Circuit wrote:

> Since we find this case so clear on its merits, we do not reach the procedural and jurisdic-

Defendant Hugh Carey, the Governor of New York, and defendant Secretary of State argue dismissal of the complaint is mandated because neither is subject to statutory duties concerning the registration of voters or the conduct of the election, and as such, they are not proper parties.

It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act. *McCrimmon v. Daley*, 418 F.2d 366, 368 (7th Cir. 1969); *Oliver v. Board of Education of City of New York*, 306 F.Supp. 1286, 1288 (S.D.N.Y.1969); *Coon v. Tingle*, 277 F.Supp. 304, 306 (N.D.Ga.1967); *Fitts v. McGhee*, 172 U.S. 516, 530, 19 S.Ct. 269, 274, 43 L.Ed. 535 (1899). As noted above, Election Law § 291 [9] requires the Secretary of State to prepare a certified list of electors after the final canvass is approved by the State Board of Canvassers, and to procure the Governor's signature. Although the function performed by both officials in this context is seemingly ministerial, a reading of the provision indicates that the electors' appointment is not validated until both officials have completed their statutory duties. Since both play a part in the enforcement of the scheme to choose electors, both are clearly proper parties and subject to suit.

While the point is not raised by defendant City Board of Election, defendant State Board of Election moves to dismiss on the ground that, as a state agency, it is immune from suit under 42 U.S.C. § 1983. Extended discussion is not required of the well-settled principle that counties, municipalities, or their agencies are not "persons" answerable to plaintiffs in an action at law or suit in equity, brought pursuant to the Civil Rights Act of 1871. 42 U.S.C. § 1983. *Aldinger v. Howard*, 427 U.S. 1, 16, 96 S.Ct. 2413, 2421, 49 L.Ed.2d 276 (1976); *City of Kenosha v. Bruno*, 412 U.S. 507, 512–513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 187–191, 81 S.Ct. 473, 484–486, 5 L.Ed.2d 492 (1961); *Brault v. Town of Milton*, 527 F.2d 730, 732 (2d Cir.), *on rehearing*, 527 F.2d 736 (2d Cir. 1975) (*en banc*). Clearly, a § 1983 action is not maintainable against either the City or State Board of Elections.

The question remains, however, whether a cause of action seeking injunctive relief flows directly from a violation of the fourteenth amendment, rendering a state or municipality subject to the jurisdiction of the court under 28 U.S.C. § 1331(a).[10] The granting of equitable relief premised directly upon the Constitution has long been a practice accepted without discussion. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 404, 91 S.Ct. 1999, 2008, 29 L.Ed.2d 619 (Harlan, J., concurring, 1971); Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv.L.Rev. 1532 *pas-*

---

tional points relied upon by the district court. *Phillips v. Rockefeller, supra* at 979.

9. *See, supra*, n. 7.

10. Plaintiffs, as well, assert a claim for damages also premised upon the fourteenth amendment of the Constitution. They seek to recover $2 million, representing the amount expended by plaintiffs in the Presidential campaign in New York.

The question of whether the violation of the fourteenth amendment itself gives rise to a cause of action for damages has not been decided in this circuit. *See Brault v. Town of Milton*, 527 F.2d 730 (2d Cir.), *on rehearing*, 527 F.2d 736 (2d Cir. 1975) (*en banc*). We find it unnecessary to answer this question since we find independent jurisdictional bases exist for plaintiff's § 1983 cause of action and their

claim for injunctive relief predicated on the equal protection clause.

Other circuits have found jurisdiction over damage actions premised on the fourteenth amendment. *See Cox v. Stanton*, 529 F.2d 47 (4th Cir. 1975); *Construction Industry Association of Sonoma County v. City of Petaluma*, 522 F.2d 897 (9th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976); *Hanna v. Drobnick*, 514 F.2d 393 (6th Cir. 1975); *Muskegon Theatres, Inc. v. City of Muskegon*, 507 F.2d 199 (6th Cir. 1974); *Roane v. Callisburg Independent School District*, 511 F.2d 633 (5th Cir. 1975); *Fitzgerald v. Porter Memorial Hospital*, 523 F.2d 716 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1518, 47 L.Ed.2d 768 (1976).

*sim* (1972); *See, e. g., Loving v. Com. of Va.*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).[11] Where a state or municipal agency is alleged to have deprived individuals of equal protection of the laws, it may be the subject of the federal court's exercise of equitable powers. The City and State Boards of Elections are not immune and may lawfully be enjoined from debasing or diluting the votes of qualified citizens.[12]

■ The State Board of Elections' reliance on *Aldinger v. Howard, supra*, in arguing that once it is found immune from suit under § 1983, it should not be brought back into the action under a different theory, is misplaced. This is not a case where plaintiffs seek to premise jurisdiction on a pendent state claim. Clearly an independent basis of federal jurisdiction exists in 28 U.S.C. § 1331(a). *Aldinger v. Howard, supra*, 96 S.Ct. at 2422.

■ Defendant State Board of Elections additionally argues that it is not a proper party to the action since it has little if anything to do with the registration of voters and administration of elections. The court disagrees. Although the County Boards of Election have the primary responsibility for conducting both voter registration and the general election itself,[13] it cannot be said that the State Board is entirely removed from the electoral process. Pursuant to § 470 of the Election Law,[14] the State Board is vested with the responsibility of enforcing the provisions of the election laws. It was the intent of the Legislature in creating the State Board of Elections that a coordinating agency exist to oversee the execution and enforcement of the laws relating to the elective franchise and to foster citizen confidence in the political process. Election Law § 466. Hence, it can hardly be argued the State Board is not a proper party to this action. *McCrimmon v. Daley, supra.*

11. Section 1331 requires that the "matter in controversy [exceed] the sum or value of $10,000." In cases in which injunctive relief is sought, the amount in controversy may be measured by either "the value of the right sought to be gained by the plaintiff . . . [or the] cost [of enforcing that right] to the defendant." *Hedberg v. State Farm Mutual Automobile Insurance Co.*, 350 F.2d 924, 928–29 (8th Cir. 1965) (Blackmun, J.; dictum). Accord, e. g., *Tatum v. Laird*, 144 U.S.App.D.C. 72, 444 F.2d 947, 951 & n. 6 (1971), *rev'd on other grds.*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Williams v. Phillips*, 360 F.Supp. 1363, 1365 (D.D.C.1973); C. Wright, *Federal Courts*, §§ 34, 134–35 (1976). In the present case, should a new election be necessary, according to the defendants the cost of state and local boards of election would be in the area of $1,350,000.

12. Nor should the eleventh amendment serve to bar plaintiffs from proceeding against the State Board of Elections in seeking equitable relief. *Edelman v. Jordan*, 415 U.S. 651, 663–667, 94 S.Ct. 1347, 1355–1357, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

13. The County Boards are charged with the responsibilities of appointing election inspectors (Election Law §§ 39 and 40), preparing voting machines (Election Law § 250), registering voters (Election Law §§ 153 and 154), and the canvassing of election returns (Election Law §§ 270, *et seq.*).

14. Section 470 of the Election Law provides that:

a. The state board of elections shall have jurisdiction of, and be responsible for, the execution and enforcement of the provisions of this article and other statutes governing campaigns, elections and related procedures.

b. Whenever the state board of elections or other board of elections shall determine, on its own initiative or upon complaint, or otherwise, that there is substantial reason to believe a violation of this article or any code or regulation promulgated thereunder has occurred, it shall expeditiously make an investigation which shall also include investigation of reports and statements made or failed to be made by the complainant and any political committee supporting his candidacy if the complainant is a candidate or, if the complaint was made by an officer or member of a political committee, of reports and statements made or failed. to be made by such political committee and any candidates supported by it. The state board of elections, in lieu of making such an investigation, may direct the appropriate board of elections to make an investigation. The state board of elections may request, and shall receive, the assistance of the state police in any investigation it shall conduct.

Finally, it is argued that the action should be dismissed for plaintiffs' failure to join all fifty-seven County Boards of Election, as well as the Democratic Presidential electors, as necessary parties to this action. Although, as defendants contend, a successful candidate is a necessary party under New York law in a suit to recover his position, *Matter of Ullman v. Power*, 17 A.D.2d 792, 232 N.Y.S.2d 711, *aff'd*, 12 N.Y.2d 724, 233 N.Y.S.2d 774, 186 N.E.2d 129 (1962); *Lohmaier v. Ulster County Board of Elections*, 50 A.D.2d 1055, 377 N.Y.S.2d 726 (1975), in this case the federal law governs in procedural matters. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Rule 19 of the Federal Rules of Civil Procedure vests the court with wide discretion in deciding whether to proceed in the absence of necessary parties; application of the joinder rules requires a balancing of interests, *Kamhi v. Cohen*, 512 F.2d 1051, 1054–1055 (2d Cir. 1975). Determinations of indispensability and necessity are grounded in equitable principles, *Toney v. White*, 476 F.2d 203, 207 (5th Cir.), *modified and aff'd on rehearing*, 488 F.2d 310 (1973). Were we blessed with the luxury of time in this matter, the express terms of Rule 19(b) would require joinder since all parties are subject to process and their addition would not defeat the court's power to hear the matter. Yet, where it is only a matter of days within which this court must act,[15] and the interests of the successful electors are adequately protected by counsel for the existing defendants, equity demands that the court proceed in their absence, *Toney v. White, supra* at 207.

Accordingly, we turn to a consideration of whether the complaint states a claim upon which relief can be granted.

## II.

The Supreme Court has unequivocally stated that

the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . .

*Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964) (citations omitted). The right to vote may not be denied by alteration of ballots, *see United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368 (1941), nor "diluted" by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1880); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944). As the Supreme Court said in *Reynolds v. Sims, supra*, where political districting in Alabama was challenged under the fourteenth amendment:

[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

377 U.S. at 555, 84 S.Ct. at 1378 (footnote omitted). *See Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 52, 90 S.Ct. 791, 793, 25 L.Ed.2d 45 (1970); *South v. Peters*, 339 U.S. 276, 279, 70 S.Ct. 641, 643, 94 L.Ed. 834 (1950) (Douglas, J., dissenting); *Hennings v. Grafton*, 523 F.2d 861, 863–64 (7th Cir. 1975). Thus, while *Reynolds v. Sims* was a case involving re-apportionment, there appears to be little distinction, insofar as the fourteenth amendment is concerned, between dilution of a citizen's vote through malapportioned political districts and dilution of valid ballots through votes cast by ineligible voters.

Despite the importance placed by the Supreme Court on the right to vote and the integrity of elections, not every election irregularity will give rise to an equal protection or due process claim. The Second Circuit Court of Appeals rejected the argu-

---

**15.** New York State's Presidential electors are scheduled to meet and record their votes on Monday, December 13, 1976. Election Law § 292.

ment that administrative infirmities in an election, in the absence of "willful or knowing" dilution of ballots, create a remedy in federal courts. In *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970), the court noted:

> Were we to embrace plaintiffs' theory, this court would henceforth be trust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts. (footnote omitted)

See *Hennings v. Grafton, supra* ; *Pettengill v. Putnam County R–1 School Dist. Unionsville, Mo.*, 472 F.2d 121 (8th Cir. 1973); *Means v. Wilson*, 383 F.Supp. 378 (D.S.D. 1974).

■■■ Allegations of misconduct in the administration of a state election must be judged in light of principles governing claims under the fourteenth amendment and § 1983. It is necessary, first of all, to plead and prove specific acts of misconduct, including the time, place and circumstances of the alleged deprivation of the right to vote. See *Snowden v. Hughes*, 321 U.S. 1, 10, 64 S.Ct. 397, 402; 88 L.Ed. 497 (1944); *Means v. Wilson, supra* at 389. *Cf.* Federal Rules of Civil Procedure 9(b). Second, "uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only it if represents 'intentional or purposeful discrimination.' " *Powell v. Power, supra* at 88, *quoting* Snowden v. Hughes, supra, 321 U.S. at 8, 64 S.Ct. at

401. See *Swain v. State of Alabama*, 380 U.S. 202, 204–05, 85 S.Ct. 824, 827, 13 L.Ed.2d 759 (1965); *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). *Cf. United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). Purposeful deprivation of the right to vote will not be assumed merely because there is evidence that election officials acted incompetently or negligently and, as a result, persons not properly registered were permitted to vote. Rather, intentional acts must be proven, "the quantum of proof necessary being a matter of federal law." *Swain v. State of Alabama, supra*, 380 U.S. at 205, 85 S.Ct. at 827 (1965), *citing* Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). See also *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Third, whether the claim for injunctive relief is predicated on § 1983 or the remedy is sought directly under the fourteenth amendment, the fraud or other unlawful behavior must be committed by persons acting under color of state law, *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), or by private persons acting jointly with state officials, *United States v. Price, supra*, 383 U.S. at 794 & n. 7, 86 S.Ct. at 1157 & n. 7.[16] Finally, the party seeking a new election must establish that the fraud or other unlawful behavior changed the outcome of the election. In the absence of proof of a causal relationship between the unlawful conduct and the result of the election, injunctive relief must be denied. See *Starr, Federal Invalidation of State Elections*, 49 N.Y. U.L.Rev. 1092, 1124–27 (1974). *Cf. Lehner v. O'Rourke*, 339 F.Supp. 309, 314 (S.D.N.Y. 1971).

---

**16.** Section 1985(3) of Title 42, United States Code, creates civil liability against any persons who conspire to deprive other persons or a class of persons of "the equal protection of the laws, or of equal privileges and immunities under the laws." There is some doubt, however, that § 1985 embraces purely private conspiracies, involving no governmental action, that interfere with fourteenth amendment rights. *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974); *Gibbs v. Titelman*, 502 F.2d 1107, 1110 n. 69 (3d Cir.), cert. denied, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). See *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In any event, in the present case the allegations are directed at the conduct of state officials or persons acting pursuant to state law.

■ The burden which plaintiffs must meet is a heavy one. Moreover, even if a claim is stated under this standard, plaintiffs bear an even heavier burden in demonstrating the necessity for a new election. In the present case, ordering a new Presidential election in New York State could involve the most serious consequences, raising the question of "whether the relief, if given, might not do more harm than good." *MacDougall v. Green*, 335 U.S. 281, 286, 69 S.Ct. 1, 3, 93 L.Ed. 3 (1948) (Rutledge, J., concurring). President-elect Carter's victory in New York will provide him with the margin of victory in the Electoral College, which meets on December 13, 1976, to complete the nation's quadrennial task of choosing a President. If New York's electors are disqualified from casting their ballots, and a new election in New York is necessary, possibly no candidate would receive sufficient votes to be elected President.[17] The delay attendant in holding a new election in New York might disrupt the governing process and leave the nation without a legitimate leader for an unpredictable length of time.

■ The point, however, is not that ordering a new Presidential election in New York State is beyond the equity jurisdiction of the federal courts. Protecting the integrity of elections—particularly Presidential contests—is essential to a free and democratic society. *See United States v. Classic, supra.* It is difficult to imagine a more damaging blow to public confidence in the electoral process than the election of a President whose margin of victory was provided by fraudulent registration or voting, ballot-stuffing or other illegal means. Indeed, entirely foreclosing injunctive relief in the federal courts would invite attempts to influence national elections by illegal means, particularly in those states where no statutory procedures are available for contesting general elections.[18] Finally, federal courts

17. The twelfth amendment to the Constitution, which governs Presidential electors, provides in pertinent part:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President.

This language raises the issue of whether "the whole number of Electors appointed" means the number of electors elected and certified by the individual States, as opposed to the combined electoral votes of all the States. See 3 U.S.C. § 5. If the former is the proper construction, then President-elect Carter need only receive a majority of the votes of those electors who are "appointed" by their States and who cast their ballots in the Electoral College. Even if New York's electoral votes are withheld pending a new election, the Electoral College could "meet" and elect Mr. Carter. At present, President-elect Carter has 297 electoral votes committed to him, while President Ford's total is 241. Assuming that the Presidential electors in all other States are "appointed" and cast their ballots, excluding the ballots of New York's forty-one electors would still leave President-elect Carter with 256 electoral votes to President Ford's 241, a clear majority of "the whole number of Electors appointed."

Furthermore, even if a majority of the combined electoral votes of the States is required to elect a President, the twelfth amendment directs the House of Representatives, in the event no person is able to achieve a majority, to "immediately" choose a President. It is possible that, should New York's electors fail to cast their ballots, the House of Representatives would meet and select a President before a new election could be held in New York.

18. It is unclear, for example, whether the State of New York provides either a forum to challenge the outcome of a general election on grounds of fraud or an adequate remedy in the event serious fraud in a general election is established. Under § 330 of the New York Election Law, the State Supreme Court has summary jurisdiction over challenges to pri-

in the past have not hesitated to take jurisdiction over constitutional challenges to the validity of local elections and, where necessary, order new elections.[19] The fact that a national election might require judicial intervention, concomitantly implicating the interests of the entire nation, if anything, militates in favor of interpreting the equity jurisdiction of the federal courts to include challenges to Presidential elections.

 But before a federal court can responsibly order a new election, the claimants seeking this extraordinary relief must come forward with the most clear and convincing evidence that state officials or persons acting under color of state law, by intentionally depriving qualified voters of the right to vote, altered the outcome of the election.[20] A party contesting a Presidential election carries a heavy burden. Not to put too fine a point on it, this standard implies conduct of a most egregious nature, approximating criminal activity.

 Therefore, in judging whether the complaint before us states a claim upon which relief can be granted, the plaintiffs must allege, and be prepared to prove, the following:

(1) that specific acts of fraud or other unlawful behavior were committed in the conduct of the election;

(2) the fraud or other unlawful behavior was committed with the intent or purpose of depriving qualified voters of their constitutionally protected right to vote;

(3) the fraud or other unlawful behavior was committed by persons acting under the color of state law; and

(4) the fraud or other unlawful behavior changed the outcome of the election.

Applying these standards to the pleadings in this case, we find the complaint, as presently drawn, does not state a claim upon which relief can be granted. Rather than dismiss the complaint with leave to replead, because of the time considerations we grant the plaintiffs an evidentiary hearing on their request for a preliminary injunction. At this hearing, plaintiffs will be allowed to amend the pleadings to conform to the proof. The defendants' motions to dismiss are denied.

An evidentiary hearing will be held on December 8, 1976, at 9:30 A.M. It is

SO ORDERED.

## OPINION FOLLOWING EVIDENTIARY HEARING

The court held an evidentiary hearing in accordance with its memorandum of decision dated December 7, 1976.

---

**19.** E. g., Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967); Hamer v. Campbell, 358 F.2d 215 (5th Cir.), cert. denied, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); Ury v. Santee, 303 F.Supp. 119 (N.D.Ill. 1969). See Perkins v. Matthews, 336 F.Supp. 6 (S.D.Miss.1971) (Voting Rights Act); Cousins v. City Council of City of Chicago, 361 F.Supp. 530 (N.D.Ill.1973); Dollinger v. Jefferson Cty. Comm'rs Court, 335 F.Supp. 340 (E.D.Tex. 1971); Mann v. Davis, 238 F.Supp. 458 (E.D. Va.1964), order aff'd, 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698 (1965).

**20.** Under § 271 of the Election Law, any qualified voter can challenge another person's application for registration. Presumably, the plaintiffs were aware of the alleged illegal registrations prior to November 2nd, yet they have not brought to our attention any pre-election efforts to challenge the registrations.

mary elections. The only remedy a candidate or his supporters have under § 330 in a general election, however, "is that the state court may direct a recanvass or the correction of any error in the canvass . . . it cannot look behind votes cast on a voting machine to determine whether the persons who cast them were qualified to do so." Lehner v. O'Rourke, 339 F.Supp. 309, 313 (S.D.N.Y.1971). While some state court decisions refer to the institution of a quo warranto proceeding to challenge a general election, e. g., Corrigan v. Board of Elections of Suffolk County, 38 A.D.2d 825, 329 N.Y.S.2d 857 (2d Dep't.), aff'd, 30 N.Y.2d 603, 331 N.Y. S.2d 35, 282 N.E.2d 122 (1972); Periconi v. Power, 48 Misc.2d 391, 265 N.Y.S.2d 22 (Sup. Ct.1965), it is uncertain whether such a proceeding is available to contest a Presidential election and, more importantly, whether state courts have inherent authority to order a new Presidential election in the absence of statutory authorization. See Matter of U.S. Labor Party, N.Y.L.J. at 10, col. 2 (Sup.Ct.N.Y.County, Nov. 24, 1976).

Plaintiffs, through the use of statistical survey techniques, sought to prove that the November 2, 1976, Presidential election in New York was permeated by voter fraud. A random sample of 2,434 voters, representing 42% of the State's 1976 voting population—2,821,699 voters—was used to project the minimum number of irregular votes cast in the election. The sample of 2,434 voters was divided into four distinct classes:

CLASS A) 660 "new" registrants drawn from 32 Assembly Districts ("A.D.'s") in New York City considered by plaintiffs to be most prone to voter irregularities;

CLASS B) 608 "old" registrants drawn from the 32 A.D.'s in New York City considered by plaintiffs to be most prone to voter irregularities;

CLASS C) 263 registrants drawn from the remaining 32 A.D.'s in New York City;

CLASS D) 903 registrants drawn from 62 townships or election wards in Buffalo, Syracuse, Rochester, Erie County and Albany.

The sample voters were chosen in the following manner. In New York City, two election districts ("E.D.'s") from each of the City's A.D.'s were randomly selected through a recognized procedure that utilizes a table of random numbers. Field investigators, working from the ledgers of signed buff cards, recorded the name of every tenth voter (old or new, depending on the particular class) in each of the designated E.D.'s. The methods employed to gather the upstate sample varied slightly. In Erie County, voters were drawn from a townships' entire voter population if the town, because of its size, was not subdivided into wards. Otherwise, two E.D.'s in each ward of the upstate cities were randomly chosen and the selection of sample voters was conducted in the manner described above.

Once the sample was fully compiled, field workers were carefully instructed on investigating voter fraud. A "fraudulent vote" was defined as a vote cast by an individual found not to reside at the address listed on the registration card, for example, a ballot cast by a person registered from an abandoned building or a vacant lot. Using data sheets listing the individual names and addresses of sample voters, volunteers attempted to contact each voter by telephone to ascertain whether he or she in fact lived at the recorded registration address and whether the registrant had voted in the November 2, 1976 election. If an affirmative response was received, the vote was listed as "conformed valid."

Field investigators were deployed to investigate each voter who could not be reached by telephone. If the voter was found to reside at the recorded address and to have voted in the November election, his vote was designated "confirmed valid." If the voter was not found at the listed address, investigators interviewed neighbors or the building's superintendent. Only if the investigators found no evidence of the sample voter's existence, was the vote cast listed as a "confirmed fraud." Unless there was confirmation by two separate teams of investigators that either a sample voter did not reside at the address of registration or that registration was from an abandoned building or empty lot, the vote cast received only a designation of "unconfirmed fraud." In some instances, individual determinations of fraud were corroborated by documentary or photographic evidence.

After the study's completion, the following data was compiled:

| Class | Population Size | Sample Size | Confirmed Frauds | % of Sample | Unconfirmed Frauds | Total Frauds | Total B of Sample |
|---|---|---|---|---|---|---|---|
| A | 209,040 | 660 | 44 | 6.67% | 45 | 89 | 13.48% |
| B | 685,133 | 608 | 44 | 7.23% | 81 | 125 | 20.55% |
| C | 1,272,413 | 263 | 11 | 4.18% | 13 | 24 | 9.12% |
| D | 655,083 | 903 | 29 | 3.21% | 38 | 67 | 7.41% |
| Total | 2,821,669 | 2,434 | 128 | 4.9% (weighted) | 177 | 305 | 10.8% (weighted) |

The data, as compiled, was turned over to Dr. Steven Bardwell, a statistical expert. Employing standard statistical methodology, Bardwell extrapolated the absolute findings over the represented 42% of the voter population and drew the following conclusions:

| Class | Population Size | Min. % of Irregular Votes (Confirm. Frauds) | Min. % of Irregular Votes | Larger % of Irregular Votes Confirm. & Unconfirm. Frauds | Larger No. of Irregular Votes |
|---|---|---|---|---|---|
| A | 209,040 | 6.67% | 13,797 | 13.48% | 28,220 |
| B | 685,133 | 7.23% | 50,015 | 20.55% | 141,137 |
| C | 1,272,413 | 4.18% | 53,434 | 9.12% | 115,789 |
| D | 655,083 | 3.21% | 20,961 | 7.41% | 20,962 |
| TOTAL | 2,821,669 | 4.9% | 138,207 | 10.8% | 306,108 |

During his testimony, Dr. Bardwell cautioned that further projection of the absolute findings could not be made over the remaining 58% of the voter population. Moreover, he candidly stated that since the partisan nature of the vote was not a factor in drawing his conclusions, there was no way to determine, through his study, what percentage of the irregular vote was cast for Mr. Carter or Mr. Ford.

▓ Plaintiffs' theory is that their sampling demonstrated that widespread irregularities probably deprived President Ford's electors of their victory. *Lehner v. O'Rourke,* 339 F.Supp. 309 (S.D.N.Y.1971). Where, as here, direct testimony is unobtainable, opinion testimony based on reliable hearsay is admissible, *Public Utilities v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *Bohus v. Board of Election Commissioners,* 447 F.2d 821 (7th Cir. 1971); *United States v. Aluminum Company of America,* 35 F.Supp. 820 (S.D.N.Y.1940); *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass.1953), *aff'd without opinion,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

▓ The relevance of this testimony in determining the extent of the irregularities in the vote for Presidential electors depends directly on the "universe" selected for study. If the universe is properly defined, the reliability of the study, in turn, depends on whether the sample selected evidences the characteristics of the universe. The theory upon which a sample is admissible as proof of the universe is that ". . . the 'universe' is, by reason of its uniformity or by reason of some predictable uniformity of recurrence of differences without it, susceptible of fair representation by a randomly selected sample, so that the characteristics of the 'sample' will, within mathematically measurable limits of reliability, evidence the characteristics of the universe." Judge John F. Dooling, Jr., *Polls, Samples, Surveys and Scientific Evidence,* Seminar for Newly Appointed United States District Judges (Feb. 12–16, 1962, Monterey, Cal.). If the sample is properly selected, the characteristics of the sample may be attributed to the entire universe. Note, *Public Opinion Surveys as Evidence: The Polls Go To Court,* 66 Harv.L.Rev. 499 (1953). If the universe is not properly defined, or the sample is not properly selected, it follows that the opinion evidence is irrelevant.

The irregularities are based on evidence that persons were permitted to vote from addresses of buildings shown to have been abandoned and from vacant lots. The plaintiffs claim that the improprieties resulted from the negligence of the New York City Board of Elections and the 57 County Boards of Elections in registering voters by mail, their failure to verify the residences of potential voters, and the failure of the election inspectors to require proof of eligibility. These irregularities, which, for the sake of this argument, we assume to have taken place, are based only on a sample consisting of approximately 600

registrants in 32 Assembly Districts in the City of New York, determined by the survey team to be those suspected of a higher degree of irregularities in voter registration than the remaining 32 districts.[1] There is no showing, however, that characteristics of the sample bear the characteristics of any other area in the State. Since the five county boards are under the jurisdiction of the New York City Board of Election, we assume that the practices of those boards are uniform. The sampling of 32 Assembly Districts would be a fair sampling of irregularities resulting from mail registration in the City of New York. It does not sample irregularities arising out of mail registration in the remainder of New York. The court therefore does not consider the evidence relevant to the claim of fraud arising out of mail registration.

Plaintiffs sampled the balance of the registrants in the first set of 32 assembly districts, all the registrants in the rest of New York City's assembly districts and registrants in some upstate areas, including Syracuse, Rochester, Albany and Erie County.[2] Though this sampling for fraud is more representative of the universe than that conducted of the mail registrants, its value in predicting the characteristics of the universe is in doubt because it fails to include the other 53 counties of the state.

In designing their study, plaintiffs defined the universe as "restricted to the urban areas of New York State" (Dec. 8, 1976, Tr. 18), comprising 42% of the voter population. Yet, the plaintiffs' own expert, Dr. George E. Bardwell, defined the appropriate universe as "[t]he entire State of New York and the voters in the last Presidential election" (Dec. 9, Tr. 221), i. e., the 6,668,262 voters who cast ballots in the Presidential contest. In order to attribute the voter fraud in 42% of the State to the entire Presidential vote in New York, the sample should have included voters in the remaining 53 counties, or, in the alternative, plaintiffs should have shown that the election practices in the unsampled areas were similar to those of the sampled areas.

Even if arguendo, the proper universe had been tested, and a proper voter sample selected, nonetheless, plaintiffs' evidence of voting irregularities is susceptible of inferences other than fraud. It is conceivable that in many of the instances where "old" registrants who voted did not reside at the address of registration, there was no fraud at all. Given the existence of a permanent registration system in New York, many of these voters may live in the New York area, but at a different address, and simply never bothered to change their voting address. Similarly, in view of the highly transient nature of urban populations, it is possible that some new registrants changed residences between the time their registration application was filed and election day. This is not to say that such irregularities should be condoned and that serious efforts should not be made to correct these administrative deficiencies, yet, such votes cannot be considered "fraudulent" in any real sense.

Moreover, even if we accept plaintiffs' contentions that 306,107 "fraudulent" votes

1. Betty Dolan, executive director testified that 468,586 mail applications were received by the New York City Board of Elections. Approximately 20,000 were denied when inquiries to the applicants were returned. Approximately 448,000 applications were then distributed to the five county boards for processing. This included mailing identification cards to the registrants and a card advising the registrant of the location of the polling place of his election district. The County Board also made out the buff cards and pasted the exemplars of the registrants signature (attached to the application) on the copies of the buff cards. They were then forwarded on to the election district for use at the polls. One of many of plaintiffs' claims is that mail applications were accepted subsequent to 30 days prior to the date of election in violation of § 153(3) of the Election Law. John Stewart of the Rockland County Conservative Party testified that he examined mail applications for registration on December 6th and 7th, 1976. He states he found 376 applications without a date stamped on the application and of 376 registrants, 180 voted. There is no proof of voting by applicants where the applications were stamped subsequent to 30 days prior to the date of election.

2. Erie County consists of Buffalo and 27 towns.

were cast primarily in New York's urban areas, as a matter of mathematics, plaintiffs have failed to establish that the outcome of the election would have been different in the absence of fraud. As Dr. Bardwell conceded, the partisan nature of the vote was not a factor in his statistical survey (Dec. 8, Tr. A61). As such, it is impossible to determine what percentage of the fraudulent vote went to Mr. Carter and what portion went to President Ford. Nor have plaintiffs presented any independent evidence that would provide a basis for this court to conclude that Mr. Carter's margin of victory was derived from fraudulent votes. Even if we were to generously concede that 90% of the extrapolated fraudulent vote went for Mr. Carter, this constitutes 275,496 votes, less than President-elect Carter's 288,767 vote margin of victory.

In sum, the plaintiffs have failed to prove that specific acts of fraud were performed by persons acting under color of state law, or that the irregularities in the voting, if eliminated from the final tally, would have changed the result. Accordingly, the court finds no likelihood that plaintiffs will prevail on the merits. It is therefore

ORDERED that plaintiff's motion for a preliminary injunction is denied, and defendants' motion to dismiss the complaint is granted.

The Clerk of the Court is directed to enter judgment in favor of the defendants and against the plaintiffs, dismissing the complaint.