THE GREEN PARTY OF THE STATE OF NEW YORK, Ronnie Dugger, Mark Dunau, "Grandpa" Al Lewis, and Craig Seeman, Plaintiffs,

v.

Stephen WEINER, Weyman A. Carey, Michael J. Cilmi, Ronald J. D'Angelo, Douglas A. Kellner, Terrence C. O'Connor, Crystal N. Paris, Gertrude Strohm, Frederic Umane, Vincent J. Velella, and Thomas R. Wilkey, Defendants.

No. 00 CIV 6639(GEL).

United States District Court,
S.D. New York.

Feb. 11, 2002.

Daniel C. Marotta, Dowd & Marotta, P.C., New York, N.Y. for Plaintiffs The Green Party of the State of New York, Ronnie Dugger, Mark Dunau, and "Grandpa" Al Lewis.

Harry Kresky, New York NY, (Gary Sinawski, New York, NY) for Intervenor–Plaintiffs New York County Independence Committee, Arthur Canady, Sharon Jackson, Scheryl Burks, Nancy Ross, Joyce Weisberger, and Cynthia Jenkins, of counsel.

Kevin R. Dantzler, Assistant Corporation Counsel, New York, NY, for Defendants Stephen Weiner, Weyman A. Carey, Michael J. Cilmi, Ronald J. D'Angelo, Douglas A. Kellner, Terrence C. O'Connor, Crystal N. Paris, Gertrude Strohm, Frederic Umane, and Vincent J. Velella.

Todd D. Valentine, State Board of Elections, Albany, N.Y. for Defendant Thomas R. Wilkey.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs, The Green Party of the State of New York, Ronnie Dugger, Mark Danau, and "Grandpa" Al Lewis, bring this action against several Commissioners of the New York City Board of Elections (the "City Defendants") and Thomas R. Wilkey, the Executive Director of the New York State Board of Elections, alleging various deprivations of their federal constitutional rights, primarily in connection with the defendants' administration of the primary election that took place in New York City on September 12, 2000. The matter is before the Court on Plaintiffs' and City Defendants' cross-motions for summary judgment and defendant Wilkey's motion to dismiss. In addition, The New York County Independence Committee and seven of its members (the "Intervenor–Plaintiffs") have moved to intervene in the pending action. After careful consideration of the parties' submissions, the plaintiffs' motion for summary judgment and defendant Wilkey's motion to dismiss are each denied. The City Defendants' motion for summary judgment is granted, and the Intervenor–Plaintiffs' motion to intervene is denied as moot. Accordingly, judgment will be entered for defendants.

### Facts

Most of the claims in this lawsuit concern the primary election that took place in New York on September 12, 2000. Nearly three million registered voters in New York City were eligible to vote in that primary, and voting took place at 1,340 poll sites across the City, using 5,600 voting machines which had been configured for the primary election. (DeFrancesco Decl. ¶ 8.) The most important office at stake in the election was a seat in the United States Senate, but contested primaries for numerous other state, local and party offices, within several different parties, were held throughout the state. This dispute centers on the decision of the New York City Board of Elections to conduct the Green Party primary on paper ballots rather than on the voting machines used for the Republican and Democratic primaries.

There is no dispute that the voting machines used by the City were incapable of accommodating the names of all eligible candidates. For a primary election, the machines require at least two columns for the candidates of each political party, and the machine only contains eight columns in total. (*Id.* ¶ 30.) Consequently, the voting machine can at most accommodate no more than four political parties. (*Id.*) Official election documents show that, as of February 2000, there were eight registered political parties in the City, and that the Green Party was the smallest of them with 1,013 registered voters. (*Id.* Ex. A.) By letter dated August 10, 2000, the New York City Board of Elections informed Kathleen Healey, the Chair of the Green Party, that its primary election would be conducted entirely on paper ballots. (*Id.* ¶ 19, Ex. E.) In that letter the Board also stated that, given the small number of voters enrolled in the Green Party (then 1,586), its ballots would be counted by Assembly District rather than their constitutive Election Districts in order "to insure the secrecy of the ballot for each individual voter." The next smallest party, the Working Families Party, with 1,970 registered voters (*id.* Ex. A), was similarly informed that its primary would be conducted on paper ballots. (*Id.* ¶ 20.) [1]

---

1. The primary election of the Conservative Party was also conducted on paper ballots in Staten Island. (DeFrancesco Decl. ¶ 20.)

On August 18, 2000, about a week after initially informing the Green Party of its decision, the City Board of Elections notified all candidates of their right to inspect voting machines on September 5, 2000. (*Id.* ¶ 15, Ex. D.) Elizabeth Shanklin, the presiding officer of the New York City Green Party in Bronx County, wrote to the Board regarding its decision to conduct the Green Party's primary election on paper ballots, and on August 22, members of the Green Party were permitted to voice their grievances at a hearing before the Board. (*Id.* ¶¶ 21–22.) At that meeting, the Commissioners presented the Green Party with two alternatives to using paper ballots. (*Id.* ¶ 23.) The Board indicated that it was willing to provide either one voting machine per Assembly District, or one voting machine in every election district that had a Green Party member. (*Id.*) Green Party representatives rejected both alternatives. (*Id.*)

On September 5, 2000, all 5,600 machines were sealed and loaded on trucks to be delivered to the appropriate poll sites. (*Id.* ¶ 16.) In addition, approximately 200,000 paper ballots were printed for Green Party voters, and special instructions were prepared for all poll workers regarding the procedures to be followed for Green Party paper ballot voting. (*Id.* ¶¶ 13–14.) This lawsuit followed shortly thereafter.

### Procedural History

The plaintiffs filed this Complaint on September 5, 2000, and simultaneously moved by order to show cause for emergency relief relating to the primary election that was to take place the following week. The Complaint alleges eleven causes of action under the First and Fourteenth Amendments to the United States Constitution, the New York State Consti-

tution and the New York Election Law. The first, second, and fifth causes of action charge that the manner in which the Election Board planned to conduct the Green Party primary placed an impermissible burden upon Green Party voters' right of association under the First and Fourteenth Amendments to the United States Constitution, and ask the Court to compel the Board of Elections to place Green Party candidates on voting machines, to require the Board to complete a count of the ballots within 48 hours of the election and to assign federal marshals to monitor polling locations during both the primary election and the general election on November 7, 2000.[2] Additionally, the sixth and seventh causes of action, also charging violations of the First and Fourteenth Amendments, seek nominal damages from the defendants for conducting of the Green Party primary on paper ballots. The third cause of action charges the defendants with "a systematic deprivation and obstruction of the right to vote" of Green Party members and demands that the Court require the purchase of new voting machines. The tenth cause of action seeks a declaratory judgment that the New York State statute setting forth the manner of appointing election commissioners violates "the Equal Protection Clause of the United States Constitution." Finally, the eleventh cause of action seeks prevailing party attorneys' fees under 42 U.S.C. § 1988.

In addition to their federal claims, plaintiffs allege three state law causes of action. The fourth claim alleges that the defendants have violated §§ 4–134 and 7–118 of New York Election Law, and seeks an order requiring to Election Board to comply with its legal obligations by posting sample Green Party ballots at each polling

**2.** The first cause of action also seeks the same relief under provisions of the New York Election Law.

place and delivering the ballots thirty minutes prior to the opening of the polls. The eighth and ninth causes of action allege violations of the right to vote and voter secrecy under the New York State Constitution.

In light of the imminence of the primary, this Court held a hearing on September 7, and filed a decision the next day denying preliminary relief. At that time, the Court noted that the allegations, if true, "establish some troubling irregularities" but concluded that it could not be said at such a preliminary stage that the plaintiffs were likely to succeed in their federal claims by showing that Board's administration of the Green Party primary was "discriminatory," that "the apparent defects ... were pervasive or intentional," or that "the defendant Board cannot or will not conduct [the] election properly." *Green Party of the State of New York v. Weiner,* 00 Civ. 6639, 2000 WL 1280913, at *2 (S.D.N.Y. Sept. 8, 2000). With respect to the state law claims, the Court stated its reservations about encroaching on the broad power granted to states by the Constitution in administering congressional elections. The Court noted that "[u]nless pervasive *federal* claims are presented, it would be rash to consider demands for sweeping provisional relief on the basis of state law claims" over which this Court has at most supplemental jurisdiction. *Id.,* at *1 (emphasis in original).

Although some claims in the complaint sought relief specific to the November 2000 general election, plaintiffs did not seek preliminary relief related to that election. Rather, the parties next appeared before the Court for a conference on January 27, 2001, in response to the Court's inquiry as to whether there was still a live dispute. Plaintiffs stated that they intended to proceed with the action. The City Defendants indicated that they intended to move for summary judgment, and defendant Wilkey stated that the claims against him were insubstantial and that he would move to dismiss. At that conference, representatives of another minority party, the Independence Party, appeared on their own initiative and moved to intervene. The Court set a briefing schedule for all the anticipated motions. These motions have now been full briefed and may be resolved on the merits.[3]

### Discussion

#### I. Mootness

■ Both the City Defendants, in their summary judgment motion, and Wilkey, in his motion to dismiss, argue that the present lawsuit should be dismissed as moot. They argue, in somewhat conclusory terms, that "plaintiffs' claims relate to the September 12, 2000 primary and these claims are now moot because the September 12, 2000 senatorial primary election has been held." (City Def. Mem. Supp. at 6.) Recognizing the exception to the mootness doctrine for disputes that are "capable for repetition yet evading review," defendants argue that the exception does not

---

**3.** The plaintiffs again sought preliminary injunctive relief in connection with the 2001 primary, once again on the very eve of the election. Plaintiffs requested that the Green Party primary be postponed. In addition, the Board of Elections learned that plaintiffs wanted to conduct the primary entirely by mail-in absentee ballots. (*See* 11/24/01 Letter from Todd D. Valentine, Esq. to the Court.) A hearing was held on September 24, 2001. To support their motion for postponement, plaintiffs submitted declarations of Green Party members describing their experiences at the polls during the morning of September 11, 2001. (Dowd Decl. Sept. 24, 2001.) Plaintiffs claimed since the Board was "unable to administer an election on paper ballots," the primary should be postponed until the Board could put Green Party candidates on voting machines. (*Id.* ¶¶ 6–7.) Plaintiffs' requests were denied.

apply here because it is "unlikely" (although they do not explain why) that future Green Party primaries will be held on paper ballots, and that even if one were, there would be sufficient time between notice and the primary for the issue to be sufficiently litigated. (*Id.*)

Plaintiffs' argument is equally cursory and uninformative. Plaintiffs have submitted only a single brief just over ten pages in length, accurately entitled "Memorandum of Law in Support of Plaintiffs' Cross–Motion for Summary Judgment and in Opposition to Defendants' Motions for Summary Judgment and to Dismiss" (hereinafter "Pl. Mem."). They address defendants' mootness argument only in the final paragraph of the brief, entitled "The Suit Is Not Moot: De Funis Does Not Apply." (Pl. Mem. at 10.) Citing no authority save the apparent reference to *De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), plaintiffs argue (without specifying which claims they are referring to) that determination of "issues regarding voter's [*sic*] rights" will affect all future elections and that courts will never have the opportunity to review voting rights violations because "the time period between the deprivation and the election is too short." (*Id.*) Both sides ignore significant differences among plaintiffs' many claims.

■ The doctrine of mootness derives from "the Article III requirement that federal courts adjudicate only 'Cases' and 'Controversies.'" *Fox v. Bd. of Trustees*, 42 F.3d 135, 139 (2d Cir.1994) (citations omitted). The Article III case and controversy requirement is a jurisdictional prerequisite, and thus mootness deprives a federal court of subject matter jurisdiction. *Id.* at 140. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct.

1944, 23 L.Ed.2d 491 (1969) (citation omitted). Plaintiffs lack such a legally cognizable interest where, for example, they would enjoy no benefit even if granted the relief which they seek. *See Wirtz v. Local Unions 410, 410A, 410B & 410C*, 366 F.2d 438, 442 (2d Cir.1966) ("Since the rights of litigants are affected by the judicial remedies available, in evaluating whether a particular appeal has become moot, attention must be focused on the particular relief sought by the appellant.")

In the present case, plaintiffs have brought four claims under the Fourteenth Amendment to the U.S. Constitution (1, 2 and 5) and New York state law (1 and 4), for which they seek injunctive relief specifically directed at the September 12, 2000, primary election and/or the November 7, 2000, general election. With respect to those elections, plaintiffs seek an order directing that Green Party candidates be placed on voting machines (claim 1), that paper ballots be counted within 48 hours of the election (claim 2), that sample ballots be posted and Green Party ballots be timely delivered to the polling places (claim 4), and that the U.S. Attorney assign a federal marshal to every polling place in the City to ensure enforcement of these remedies and of their right to vote (claim 5). Since the elections at issue have passed, the plaintiffs cannot benefit from the relief which they have requested as to these four causes of action, and thus these claims must be dismissed as moot. Plaintiffs appear implicitly to concede as much, by moving for summary judgment on all claims except these four.

■ Nor are any of these claims subject to the exception for actionable conduct that is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 514–15, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *DeFunis*, 416 U.S. at 318–319, 94

S.Ct. 1704. This exception only applies where " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)).

The claims at issue here do not satisfy the first of the required elements. The Green Party does seem to have a reasonable expectation that its primary will be held on paper ballots in the future, given the size of its membership.[4] However, it is not the case that the challenged conduct will evade review. Indeed, in this very case, the plaintiffs also seek damages for what they claim was the unconstitutional conduct of the September 2000 primary. As discussed below, those claims are not moot, and will be addressed on their merits. Thus, while the claims for injunctive relief relating specifically to the primary in 2000 are moot, the plaintiffs' other causes of action ensure that the challenged conduct will be judicially reviewed.[5] There is no need to adjudicate claims for relief that can provide no substantive benefit to anyone and have become entirely hypothetical in order to assure that the challenged conduct does not escape review.[6] Consequently, claims 1, 2, 4 and 5 will be dismissed as moot.

This conclusion does not, however, render plaintiffs' entire lawsuit moot, as the defendants appear to argue. In addition to their claims for injunctive relief concerning the elections that took place on September 7, 2001, and November 11, 2001, plaintiffs have asserted several claims, under both state and federal law, for which they seek relief that this Court does have the power to grant. Specifically, the plaintiffs seek nominal damages for alleged federal and state constitutional infractions as well as various forms of injunctive relief not tied to a particular election, including invalidation of New York's statutory method of appointing election commissioners as unconstitutional and judicial supervision of the purchase and implementation of new voting technology. These claims are not moot, and accordingly, we turn to a discussion of their merits. Because the Court has only supplemental jurisdiction over plaintiffs' state law claims, and dismissal of plaintiffs' federal claims will likely entail dismissal of the state law claims as well, we first address the federal claims.

## II. *Non–Moot Federal Claims*

Four of plaintiffs' federal claims (3, 6, 7 and 10) are not moot. The first three of these claims are essentially directed towards the administration of the September 7, 2000, Green Party primary on paper ballots. In essence, these claims charge that defendants' failure to provide a sufficient number of voting machines to accom-

---

**4.** Indeed, the same issue arose with respect to the 2001 mayoral primary in New York City, when once again the Green Party primary was held on paper ballots. See note 3 above.

**5.** Moreover, while the time between Board of Elections decisions and the elections in question is indeed short, any difficulty in reviewing matters prospectively in this case resulted in substantial part from plaintiffs' choice to wait for the last possible minute to seek court action.

**6.** Nor does this mean that plaintiffs' claims for timely injunctive relief have been frustrated. As noted above, the plaintiffs filed for a preliminary injunction, and this Court ruled on that application before the primary election took place. The Court denied that relief because the record did not support a finding that the plaintiffs were likely to succeed on the merits.

modate the Green Party primary, and the resulting use of paper ballots to conduct that primary, violated plaintiffs' right to vote and their First and Fourteenth Amendment associational rights. The fourth (claim 10) seeks to declare that New York's statutory method of appointing election commissioners is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The City Defendants and the plaintiffs have cross-moved for summary judgment on these claims, and defendant Wilkey has moved to dismiss them.

### A. Motion to Dismiss

■ In addition to arguing mootness, defendant Wilkey moves for dismissal on the grounds that he (as an agent for the New York State Board of Elections) is not a proper party in the present lawsuit. Wilkey argues that under New York Election Law, the State Board is responsible only for administering access to the ballot, whereas local election boards have sole responsibility for administering elections and for purchasing and implementing new voting technology when necessary. Consequently, Wilkey argues that he is not a proper party to the present action, because "the State Board cannot implement the relief which plaintiffs seek even if it were granted by this Court." (Wilkey Mot. Dismiss at 5.)

■ Wilkey's argument lacks merit, as suggested by his failure to cite even a single supporting case. In fact, such law as exists on this issue suggests exactly the opposite. A state official is a proper party to a lawsuit seeking to enjoin enforcement of an unconstitutional act if he is specifically authorized to enforce that act. *See Donohue v. Bd. of Elections of the State of New York*, 435 F.Supp. 957, 963 (E.D.N.Y. 1976); *Oliver v. Bd. of Ed. of City of New York*, 306 F.Supp. 1286, 1288 (S.D.N.Y. 1969). Accordingly, "a state official may

properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act." *Donohue*, 435 F.Supp. at 963 (citations omitted).

Wilkey is a proper party to this suit if the State Board plays "some role" in the enforcement of the acts complained of in plaintiffs' third and tenth causes of actions. (*See* Wilkey Mot. Dismiss at 4 (pointing to these causes of actions as the relevant claims).) As relief for the third cause of action, plaintiffs seek the purchase of new voting machines. Under the tenth cause of action, they seek a declaration that the New York State's Election Law § 3–200 *et seq.* and § 3–400 *et seq.* are unconstitutional as applied. Although defendant Wilkey is correct in asserting that under New York law, local election boards bear the primary responsibility for the administration of elections, the State Board is specifically authorized to investigate alleged violations of the Election Law and enforce the applicable provisions. *See* Election Law § 3–107 ("Authority is hereby conferred upon the state board of elections to appoint a special investigator to take charge of the investigation of cases arising under the election law, and to appoint such additional special investigators and employees as it may deem necessary."). In addition, the State Board approves voting machines (*see, e.g.*, Election Law § 7–200) and issues regulations regarding contracts for the purchase of machines (Election Law § 7–204). These connections are adequate grounds for making the State Board of Elections a proper party.

Since the State Board is a proper party, Wilkey's motion to dismiss is denied.

### B. Motions for Summary Judgment

#### 1. Summary Judgment Standard

Summary judgment may only be granted when "the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). The party opposing summary judgment "may not rest upon mere allegations or denials," but must "set forth specific facts showing that there is a genuine issue for trial." *Id.* 56(e). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, the non-moving party cannot defeat summary judgment by "offering purely conclusory allegations of discrimination," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), or by offering evidence in opposition that is merely speculative. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116–17 (2d Cir.1988). Accordingly, to defeat summary judgment, it must set forth "concrete particulars" showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

### 2. Constitutional Standards

State laws regulating the electoral process, such as those at issue here, necessarily implicate rights that lie at the core of our Constitution, including the rights to vote, to engage in free speech and association, and to enjoy the equal protection of the laws.

■ Federal courts have long recognized the right to vote as a fundamental interest protected by the Constitution. *Reynolds v. Sims*, 377 U.S. 533, 554–55, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[7] In addition, voting directly implicates the First Amendment (as applied to the states through the Fourteenth Amendment), which protects the right to form political parties for the advancement of common political goals and ideas and the corresponding right to associate with candidates of those parties through the ballot. *Anderson v. Celebrezze*, 460 U.S. 780, 786–88, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

■ "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct.

---

**7.** Paradoxically, despite this undeniable importance, the precise Constitutional grounds for the right to vote have been notoriously difficult to identify. There is no explicit mention of any "right to vote" in the Constitution itself. Nevertheless, the right to vote in federal elections for congressional representatives and senators has been inferred from constitutional provisions providing for the popular elections of congress. *See* U.S. Const. Art. II, § 2 (House of Representatives), Amend. XVII (Senate); *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (internal citations omitted) ("While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, this statement is only true in the sense that states are authorized by the Constitution, to legislate on the subject as provided by § 2, Art. I."). Similarly, there is a federal constitutional right to an equal vote in elections for state offices that is independent of any state law protections. *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Undeniably, the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections."). There is, however, no federal right to vote for electors for the President and Vice President of the United States. *See Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (citing *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892)).

2059, 119 L.Ed.2d 245 (1992) (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)). The Constitution expressly authorizes the states to regulate the "Times, Places and Manner of holding elections for Senators and Representatives." U.S. Const. Art. I, § 4, Cl. 1. Encompassed within this authority is a recognition of the states' legitimate interest in ensuring that elections are carried out in a fair and orderly manner. *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest, and if some sort of order, rather than chaos, is to accompany the democratic process."). Since every state election law inevitably imposes *some* burden upon the right to vote and attendant First and Fourteenth Amendment associational rights, subjecting every voting regulation to strict scrutiny "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. On the other hand, states do not enjoy unlimited regulatory authority over the electoral process, and federal courts have frequently been called upon to strike the appropriate balance between the constitutional rights of voters and the legitimate state interest in preventing electoral disorder. Two distinct but overlapping analytical frameworks exist for distinguishing permissible regulation of the electoral process from unconstitutional infringements of First and Fourteenth Amendment rights.

 Challenges to state electoral regulations based directly on First Amendment and Fourteenth Amendment associational rights and the right to vote are analyzed under a balancing test that modulates the degree of scrutiny to the severity of the burden imposed. When state election laws subject speech, association, or the right to vote to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. *Lerman v. Bd. of Elections*, 232 F.3d 135, 145 (2d Cir.2000) (citations omitted). The severity of the burden imposed depends both on the character of the restrictions themselves, and on the nature of the right burdened. For example, even the smallest restriction may be regarded as severe if it burdens "core political speech" by "inhibit[ing] communication with voters about proposed political change." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 192 & n. 12, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *see also id.* at 208, 119 S.Ct. 636 (Thomas, J., concurring) ("I suspect that when regulations of core political speech are at issue it makes little difference whether we determine burden first because restrictions on core political speech so plainly impose a 'severe burden'"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345–47, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (applying strict scrutiny to strike down Ohio law prohibiting the distribution of anonymous campaign literature).

 In contrast, lesser restrictions on First and Fourteenth Amendment rights and the right to vote call for a correspondingly less exacting review. A state's important regulatory interests are sufficient to justify election laws imposing lighter burdens that do not impinge upon core political speech and only regulate the "mechanics of the electoral process." *McIntyre*, 514 U.S. at 345, 115 S.Ct. 1511. *See American Constitutional Law Foundation*, 525 U.S. at 196 n. 17, 119 S.Ct. 636 (citation omitted) ("[R]egistration requirements for primary election voters and candidates for political office are 'classic' examples of permissible regulations."); *Burdick*, 504 U.S. at 436–37, 112 S.Ct. 2059 (holding that failure of Hawaii to provide for write-in candidates was per-

missible in light of easy ballot access provisions); *Munro*, 479 U.S. at 199, 107 S.Ct. 533 (Washington state statute requiring minor party candidate to receive at least 1% of all votes cast in blanket primary not a severe burden merely because compelled voters to channel expressive activity into campaign at the primary rather than general election stage). "[P]olicing this distinction between legitimate ballot access regulations and improper restrictions on interactive political speech does not lend itself to a bright line or 'litmus-paper test,' but instead requires a particularized assessment of the nature of the restriction and the degree to which it burdens those who challenge it." *Lerman*, 232 F.3d at 145–46 (internal citations omitted).

State election laws may also be challenged under the Equal Protection Clause of the Fourteenth Amendment. *See Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Anderson*, 460 U.S. at 787, n. 7, 103 S.Ct. 1564. It is axiomatic that the Equal Protection clause prohibits only "invidious" discrimination, and does not call into question "every minor difference in the application of laws to different groups." *Williams*, 393 U.S. at 30, 89 S.Ct. 5. Laws that by their own terms burden the fundamental rights of minority groups raise particular concerns of invidious discrimination, and those concerns are no less acute where the minority group is defined by shared political values rather than racial or ethnic characteristics. *Id.* at 39, 89 S.Ct. 5 (Douglas, J. concurring). Plainly, state election laws that, on their face, disproportionately burden a minority group's right to vote and corresponding associational rights are subject to strict scrutiny. *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Williams*, 393 U.S. at 31, 89 S.Ct. 5.

Even if a law that is facially neutral and subject to a lesser degree of scrutiny, that does not end the inquiry. An otherwise permissible law might still violate the Equal Protection Clause if there is evidence of an intentional or purposeful deprivation of the right to vote. *Rogers v. Lodge*, 458 U.S. 613, 621, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Gold v. Feinberg*, 101 F.3d 796, 800–01 (2d Cir. 1996); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir.1970). However, establishing such a claim requires affirmative evidence of intent since "[u]neven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'" *Powell*, 436 F.2d at 88 (quoting *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944)). Evidence of negligence or incompetence by election officials, in the absence of affirmative evidence of intent, is insufficient to establish an equal protection violation. *See Donohue*, 435 F.Supp. at 965 (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).

It is sometimes useful to distinguish between these two lines of analysis. Nevertheless, neat distinctions between challenges grounded in constitutionally protected associational rights and those arising under the Equal Protection Clause are difficult to apply in practice. This is especially the case where, as here, the allegations involve election laws that purportedly burden the First and Fourteenth Amendment rights of minor political parties. "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson*, 460 U.S. at 793, 103 S.Ct. 1564. That same burden will also raise independent Equal Protection concerns where it is imposed by

a law that facially discriminates against minority parties or results from intentionally discriminatory administration. Especially in these hybrid cases, the choice of which analysis to adopt may well prove irrelevant. Whether particular claims are characterized as equal protection claims with a First Amendment component or as First Amendment claims with an equal protection component does not alter the ultimate analysis required to resolve such claims. If the challenged restriction does not pass each of these tests, it cannot stand.

The federal claims in this action illustrate this point. The three remaining federal claims predicated on the defendants' use of paper ballots for the September 2000 Green Party primary proceed under all of the theories of liability enumerated above, alleging violations of the right to vote and associational rights (claim 3 and 6) and of the Equal Protection Clause (claim 7).[8] The other remaining claim (claim 10), charging that New York's statutory method of appointing election commissioners violates equal protection by improperly favoring the Republican and Democratic parties, also presents a hybrid claim. Although the claim explicitly invokes the Equal Protection Clause (Complaint ¶ 87), it also alleges that the challenged statutory scheme violates the "voting rights" of minority parties (*id.* ¶ 84), and (fairly read) that minority parties are disadvantaged in pursuing their political goals (*id.* ¶ 85), thus effectively invoking the right to vote

and the First Amendment rights of association and speech.

### 3. *Paper Ballots*

■ As the parties all agree, there are no material factual disputes pertaining to claims 3, 6 and 7 that could preclude summary judgment. Each of these claims is predicated on fact that the Green Party primary was conducted on paper ballots and that the Republican and Democratic Party primaries were conducted on voting machines, occurrences that neither party disputes. The only dispute remaining is a purely legal one as to whether the failure to conduct the Green Party primary on voting machines violated plaintiffs' constitutional rights.

■ Defendants' decision to conduct the September 7, 2001, Green Party primary election on paper ballots violated neither plaintiffs' right to vote nor their First and Fourteenth Amendment associational rights. As an initial matter, the use of paper ballots is plainly not subject to strict scrutiny. Unlike state regulations that have been subjected to such searching review, such as restrictions on the distribution of campaign literature, *see McIntyre*, 514 U.S. 334, 115 S.Ct. 1511, or witness residence requirements for ballot access provisions, *see Lerman*, 232 F.3d 135, use of paper ballots does not restrict core political speech because it does not "inhibit communication with voters about proposed political change." *American Constitution-*

---

8. Unlike claims 6 and 7, which specifically challenge the city defendants' decision to use paper ballots, claim 3 charges "systematic deprivation and obstruction of the right to vote of members of the Green Party" predicated on the defendants' failure to purchase sufficient machines to preclude the use of paper ballots. (Compl.¶ 49.) Despite the broader language, plaintiffs' third claim, like the others, plainly seeks redress for the defendants' failure to provide voting machines for the Green Party primary. This Court sees no material difference between the defendants' failure to purchase a sufficient number of voting machines and its decision to use paper ballots for the Green Party primary—they are two sides of the same coin. Thus in essence all three claims are grounded upon the use of paper ballots.

*al Law Foundation,* 525 U.S. at 192, 119 S.Ct. 636.

The challenged practices relate to the conduct of an internal party primary. In the general election, Green Party candidates are listed on the same voting machine ballots as the candidates of larger parties, in equal competition; we are not faced here with a system in which voters who wish to support a Green Party candidate running against a Democrat or Republican must overcome any hurdle not imposed on voters who support the major party's candidate. The use of paper ballots in the primary does not restrict the ability of Green Party members and candidates to advocate their ideas or compete with other parties for the votes of the electorate. Whether primary voting takes place on machines or paper ballots, Green Party voters and candidates for office are free to run for public office, advocate common political values, and express their approval of policies that further those values.

Nor can the use of paper ballots be seen as imposing a severe burden on associational rights. No analogous case deals with the use of paper ballots rather than voting machines in minor party primaries. Plaintiffs seek support in cases finding "severe burdens" imposed by regulations that effectively preclude ballot access for minor or third party candidates. For example, in *Anderson,* the Supreme Court found that an Ohio statute that excluded from the ballot any independent candidate for President who chose to run after mid-March of the election year imposed an impermissibly severe burden on plaintiffs' First and Fourteenth Amendment associational rights. 460 U.S. at 792–94, 103 S.Ct. 1564. (*See also* Pl. Mem. at 3.) But such regulations made it more difficult for independent or minor-party candidates to appear on the ballot and compete against the more established political parties. As the Court noted in *Anderson,* "[b]y limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Id.* at 794, 103 S.Ct. 1564.

No such claim can be made here. Whatever the mechanics of conducting the primary, Green Party candidates ran in both the primary and general elections, and thus the plaintiffs' access to the ballot and ability to present their ideas and candidates to the public has not been restricted. The method of selection of the party's candidates does not limit its access to the ballot in any way. Moreover, to the extent that this attempt to broaden ballot access imposes a burden on Green Party voters, that burden is not too great. While the record suggests that poll workers were not always adequately informed about the mechanics of conducting a paper ballot election, requiring some Green Party voters to incur some inconvenience or frustration before obtaining a ballot, the record does not contain a single example of a Green Party voter who was unable to cast a vote. There is nothing intrinsically more difficult or less dignified about filling out a paper ballot rather than using one of New York's antiquated voting machines; indeed, it is possible that the paper ballot process produces less confusion on the part of voters and a more accurate result than machines.

■ The defendants' reasons for conducting the primary on paper ballots, moreover, are rational and substantial. It may or may not be desirable for New York to purchase more or newer voting machines, or to adopt some more modern technology for conducting elections. In the wake of the 2000 presidential elections, that issue has been broadly debated around the country *See, e.g.,* Katherine Q. Seelye, *Washington Talk; Makers of Voting Machines Ply Wares,* N.Y. Times, Jan.

31, 2001, at A16 (describing Washington as "extremely friendly these days for those making election reform their business"); *Voting Technology Reform, Hearing of the Senate Commerce, Science and Transportation Committee,* Federal News Service, Mar. 7, 2001. But that debate is for the elected representatives of the people to decide, after balancing the pros and cons of different systems against their expense. There is no constitutional right to any particular method of registering and counting votes.

■ But however much the state invests in voting technology, the proliferation of parties can easily outstrip the resources devoted to elections. The Constitution does not require states to underwrite the most elaborate possible primary for every group, no matter how small. There are fewer Green Party members in the City than there are polling sites. (DeFrancesco Decl. ¶ 26.) Thus, many districts contain only a single registered Green Party voter, or none at all. Requiring separate additional voting machines for the Green Party primary for all polling places would be not merely costly but pointless. If New York decides to facilitate the ultimate goal of widespread political participation and vigorous competition by making it easy for parties to form, obtain recognition, and appear on the ballot, that commendable policy should not entail an obligation to use the same expensive technology for conducting primaries for small parties that is necessary for the efficient conduct of primaries in which millions of people will vote. Viewed in this light, the provision in question is best characterized as a mi-

nor burden regulating the mechanics of the electoral process, and can be amply justified by the State's interest in conducting efficient, fair and orderly primaries in a variety of political parties of different sizes.

■ Plaintiffs' claim that the use of paper ballots violates the Equal Protection Clause is equally faulty. In the first place, the record is completely devoid of any evidence that would permit a fact finder to conclude that any errors that resulted from the administration of the Green Party primary on paper ballots were the product of an intent to discriminate against members of the Green Party. The record, as it presently exists, contains a number of examples of mistakes and even negligence on the part of poll workers at various polling sites in the City.[9] However, evidence of mistakes and even negligence by poll workers is insufficient to defeat summary judgment on a claim of intentional discrimination, in the absence of affirmative evidence of discriminatory intent. Such affirmative evidence is lacking here.

■ In addition, it cannot be said that conducting the Green Party primary on paper ballots disproportionately affects adherents of plaintiffs' minority political group, and should thus be subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Voters are treated unequally when voting districts are drawn in a manner that ensures the votes of some will carry less weight than those of others. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (striking down apportionment scheme based on territory that gave districts with larger populations

9. The number, moreover, is not large, in relation to the total number of Green Party members. In September 2000, the Green Party had 1,623 registered members. (De Francesco Aff. ¶ 5.) Plaintiffs have specifically documented problems in the March 2000 primary for only 16 members. (Order to Show Cause, Ex. G (declarations of 15 members); Seeman Declaration ¶¶ 44, 48 (Seeman's account of his difficulties in voting).)

same representation as lesser populated districts); *Illinois State Bd. of Elections*, 440 U.S. 173, 99 S.Ct. 983 (invalidating provision of Illinois election code that resulted in higher minimum signature requirement for nominating petitions in city elections than in statewide elections because the BOE failed to show that the method for setting the city requirements— plainly not the least restrictive means— was necessary to protect a compelling state interest). The outcome in these "vote dilution" cases turns on the structure of electoral districts, or the electoral process more generally, and the manner in which that structure inequitably allocates the value of votes cast by a minority group. None of these cases suggest that merely using different voting technology for minority party primaries constitutes a burden on the fundamental right to vote in violation of the Equal Protection Clause.

Plaintiffs claim, however, that *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), radically changes prior understandings of the federal Constitution's impact on local elections. In that case, the Supreme Court appears to have found that the absence of explicit statewide standards governing the manual tabulation of votes, with the result that votes would be counted differently in different areas of a state, amounted to an impermissible denial of the right to an equal vote. Plaintiffs argue that the Court's reasoning broadens the constitutional protection afforded to voting rights by precluding different procedures for tabulating votes, and by extension invalidates the use of paper ballots and voting machines for different parties' primaries. (Pl. Mem. at 2–3.)

But this argument dramatically overextends *Bush*. The Supreme Court explicitly warned that *Bush*, if not entirely a one-day ticket, was decided on extraordinary facts, such that its holding "is limited to the present circumstances." 531 U.S. at 109,

121 S.Ct. 525. Moreover, *Bush* involved a general election, in which different methods of tabulating votes could advantage one candidate and his supporters and disadvantage his opponent. In that situation, the Court found that the Equal Protection clause "protect[s] the fundamental right of each voter in the special instance of a statewide recount under the authority of a single state judicial officer." *Id.* Even in that situation, the case did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election.

The present case is sharply distinguishable. Here, the different technologies for casting and counting votes are in effect utilized in completely distinct, separate elections, and cannot advantage one candidate over another in head-to-head competition. Nothing in *Bush v. Gore* addresses this situation, or casts any doubt on the constitutionality of New York's choices with respect to the 2000 primaries. A large party primary is different from a small party primary in ways that are highly relevant to the means used to conduct each; there is nothing invidious in New York's decision to utilize different means for very different primaries.

Accordingly, conducting the Green Party primary on paper ballots did not violate plaintiffs' rights to vote, to advocate their ideas, or to enjoy equal protection of the laws. Defendants are therefore entitled to summary judgment on claims 3, 6 and 7.

### 4. *Election Commissioners*

■ Plaintiffs' tenth claim, also alleging equal protection violations, presents somewhat closer questions. That claim alleges that New York's statutory scheme of appointing election commissioners, poll inspectors and polling clerks violates equal protection guarantees embodied in the

Fourteenth Amendment because it effectively gives the Republican and Democratic parties exclusive rights to administer elections, "ensur[ing] that minority parties will systematically have their voting rights trampled upon, their secrecy violated, their votes systematically undercounted and election results falsified." (Compl.¶ 84.) Plaintiffs' theory of liability is complex and requires some unpacking.

Plaintiffs do not allege that the New York statutes on their face violate the Equal Protection Clause, nor could they. The provisions which they challenge undoubtedly give the major political parties, (the Republican and Democratic Parties for all practical purposes) [10] broad authority in supervising the administration of elections. The major parties appoint election commissioners to both the state and local election boards. Election Law §§ 3–100, 3–200. In addition, local polling clerks and poll inspectors are nominated from lists submitted by the major parties. Election Law § 3–404. Thus, there can be no doubt that the statute on its face discriminates against minority parties, including the Green Party. Yet, it is equally clear that this exclusion of minority parties from the administration of elections does not by itself unconstitutionally burden fundamental voting or associational rights. The Supreme Court has upheld reasonable state election regulations that effectively favor the two party system, provided that they do not "completely insulate the two-party system from minor parties' or independent candidates' competition and influence." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 366–67, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (citations

omitted). This is precisely what New York has done.

In light of this standard, the challenged New York procedures for selecting election commissioners, inspectors and poll clerks have frequently been upheld against constitutional challenges. *See, e.g., Hering v. Hill,* 814 F.Supp. 356, 358 (S.D.N.Y. 1993) (finding dismissal of county deputy election commissioner on the basis of political disagreement with the commissioner constitutional); *Mirabella v. Bd. of Elections of the City of New York,* 507 F.Supp. 338, 340–41 (S.D.N.Y.1980) (dismissing class action of election inspectors who were denied reappointment on grounds that party affiliation and intra-party affiliation could be constitutionally considered in appointment decisions); *Lehner v. O'Rourke,* 339 F.Supp. 309, 314 (S.D.N.Y. 1971) (upholding procedure for appointment of electors as not discriminating against insurgents).[11] In these cases, the challenges were brought not by minor parties or their adherents, but by dissidents within the major political parties, who argued that they were prejudiced as insurgent candidates by a system that placed control of the election machinery in the hands of the major party establishments, or discharged from positions within the electoral system because they were no longer in favor with the party leadership. But while each case is somewhat distinguishable on its particular facts, all presented essentially the same, facially plausible constitutional argument as plaintiffs here: that putting the established party leadership in charge of regulating elections disadvantages those who dissent from the

---

**10.** Election Law § 1–104(24) defines "major political parties" as the two parties whose candidates for governor received the highest and the next highest number of votes at the last preceding election.

**11.** In *Lehner,* plaintiff specifically raised the claim that the statutory scheme discriminates against "persons who do not belong to either of the two major political parties." 339 F.Supp. at 314. The court declined to address that claim because Lehner, who ran as a Democrat, lacked standing to raise it. *Id.*

views of the dominant political establishment (whether they choose to express that disagreement by intra-party insurgency or by forming new political organizations). The courts have consistently rejected this claim.

Plaintiffs do not, however, appear to challenge the facial constitutionality of these various provisions of the Election Law. Rather, they charge that the selection of partisan election commissioners, poll inspectors and polling clerks is intended to and does result in a systematic and pervasive deprivation of plaintiffs' voting and associational rights. Plaintiffs' claim is supported by a number of affidavits providing testimony as to a number of troubling election irregularities occurring at polling sites in New York. Among those irregularities are several instances of poll workers ridiculing Green Party voters and providing the wrong ballots, paper ballots not being delivered to polling stations, and workers not being properly informed of polling procedures. (*See* Order to Show Cause Ex. G; Dowd Decl., dated September 24, 2001.) These affidavits, most of which were submitted in connection with plaintiffs' efforts to secure preliminary relief enjoining the September 7, 2000, senatorial primary or the September 25, 2001, mayoral primary, vary considerably in their apparent credibility and in the degree of irregularity they document, and defendants dispute many of the allegations. Nevertheless, at this stage of the litigation, the Court must and will assume that a reasonable fact-finder could accept the accuracy of the proffered testimony. Moreover, although a reasonable fact-finder could conclude that the various incidents reported, or the bulk of them, were

the result of incompetence or misunderstanding rather than malice, the Court will further assume that such a fact-finder could also infer that at least some of these episodes reflected a conscious purpose to harass or discourage Green Party voters. The only question to be addressed at this stage of the litigation is whether the dispute over the nature and magnitude of these irregularities is "material" to the dispute at hand.

In determining this issue, it is important to recognize the context in which this dispute has been presented to the Court, and in which the asserted irregularities occurred. Plaintiffs present no evidence that Board of Elections officials have discriminated in any way against minor party voters or candidates, or hindered minority parties' access to the ballot, in connection with *general* elections.[12] There is no allegation, for example, that elections officials have miscounted votes received by Green Party candidates, or undertaken to discourage likely Green Party voters, in elections in which Green Party candidates directly competed against Democrats or Republicans for public office.

Rather, the allegations of impropriety all result from the conduct of two Green Party primaries, in which various candidates were vying for the Party's line in an upcoming general election. It is not immediately apparent what stake the major parties could have in sporadic and relatively infrequent interference with the internal Green Party primary. It is certainly true that discouragement of party members or activists from voting in primaries, or interference with the conduct of primaries,

---

**12.** At most, plaintiffs allege that the delay in counting votes—due in part to the difficulty of counting paper ballots and inaccuracies in tallying them—cuts into "prime campaign time" between the primary and general election in which the Green Party candidate could prepare. (Seeman Decl. ¶¶ 68, 79.) But the delay, of at most a few days, has minimal impact on the ability to campaign.

could in theory have a remote and indirect effect on the ability of the Party to attract adherents and compete in general elections. There is no evidence, however, that the Board of Elections in any way encouraged such misconduct. On the contrary, there is evidence that poll workers were provided with written instructions setting forth specific and neutral practices for conducting the Green Party primary on paper ballots. (DeFrancesco Decl. Ex B.)

Nor can an intention to systematically interfere with the Party's primary elections be inferred. The Party is very small, and apparently posed no major threat to the major parties' domination of state and local elections. The kinds of misinformation and maladministration reported in the plaintiffs' affidavits could not have prevented a Green Party candidate from appearing on the ballot in the general election, or affected in any predictable way the identity of that candidate. Moreover, as noted above, the documented mistakes of abusive or incompetent behavior are quite few, even in comparison to the small total registered membership in the Party. There is thus no logical connection between the fact that Board of Elections officials are appointed by the major parties, the various events reported in plaintiffs' affidavits, and any possible impact on the associational rights of the Party members or the competitiveness of the Party in general elections.

As noted above, *Timmons* holds that "[t]he Constitution permits the [New York] Legislature to decide that political stability is best served through a healthy two-party system." 520 U.S. at 367, 117 S.Ct. 1364. It is entirely reasonable for New York to conclude that it would further stability and avoid political contention over electoral mechanics to divide responsibility for administration between repre-

sentatives of the main political parties, rather than to allow the party that captures electoral control of a particular jurisdiction to appoint the electoral officials. Nothing about this goal would require the State to include representatives of all of New York's many minor parties in the allocation of that responsibility; indeed, to do so could re-instate precisely the one-sided administration the State is trying to avoid by opening the possibility of coalition-building that would give one major party predominant control over the election machinery. While this recognition of the reality of the two major parties' pre-eminence undoubtedly helps support that pre-eminence, it certainly does not, on this record, constitute an "unreasonably exclusionary restriction[ ]," *id.* (citing *Williams v. Rhodes*, 393 U.S. 23, 31–32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)), on the ability of minor parties to function in New York.[13] It cannot reasonably be concluded from this record that the instances of harassment reported, assuming both that they occurred and that they were intentional on the part of the particular poll workers involved, were an inevitable and systemic result of the Election Law, rather than individual misconduct on the part of particular workers. Nor would it be reasonable to infer that the facially constitutional Election Law, which serves a number of legitimate purposes and offers clear legitimate benefits to the major political parties, was adopted in order to further the remote and illegitimate goal of enabling occasional irregular disruptions of the smooth functioning of minor party primaries. The claimed effect on the minor parties' ability to compete, if it existed at all, is too minor and remote to outweigh the State's legitimate interest in fostering the stability of its electoral system.

---

13. As noted above, there are at least eight registered political parties in New York, hardly a sign that minor parties are squeezed out of the process.

For these reasons, plaintiffs' motion for summary judgment on claim 10 is denied, and defendants' motion for summary judgment on that claim is granted.

### III. *Non–Moot State Claims*

In addition to the numerous federal claims brought in this action, plaintiffs have also charged defendants with violating the New York State Constitution and elections statutes.[14] As an initial matter, it should be noted that this Court enjoys no original jurisdiction over these state law claims since the parties to this action are not of diverse citizenship. Rather, this Court's jurisdiction arises solely under 28 U.S.C. § 1367, which provides that federal courts may exercise supplemental jurisdiction over state law claims that form the same "case or controversy" with claims over which the Court has original jurisdiction. *See* 28 U.S.C. § 1367(a). Claims are considered part of the same case or controversy where they arise from "a common nucleus of operative facts." *United Mine Workers v. Gibbs*, 383 U.S. 715, 720, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See Naftchi v. New York Univ.*, 14 F.Supp.2d 473, 492 (S.D.N.Y.1998) (effect of section 1367(a) was to codify the "common nucleus" test set forth in *Gibbs* ); 13B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567.1 (2d ed.1984; 2001 Supp.). Essentially, supplemental jurisdiction will lie if the state and federal claims arise from the same basic facts, but not "when the federal and state claims rested on essentially unrelated facts." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir.2000).

A district court, however, "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Here, the Court has granted summary judgment on all federal claims. The Court accordingly will decline to exercise supplemental jurisdiction over plaintiffs' state law claims. Indeed, the Court would reach the same result even if plaintiff's tenth claim, its most plausible claim for federal relief, had survived summary judgment.

Undeniably, the state and federal claims in the complaint overlap to a considerable degree. The state claims charge that the administering of the Green Party primary on paper ballots violated the New York State Constitution. Several federal claims, as described above, also challenged defendants' decision to administer the Green Party primary on paper ballots, under the First and Fourteenth Amendments of the U.S. Constitution. The factual basis for these federal claims—the administering of the Green Party primary on paper ballots—is indeed identical to that underlying plaintiffs' state law claims. Had any of those federal claims survived, there would be persuasive reasons for this Court to exercise supplemental jurisdiction over the state constitutional claims as well. However, none of these related federal claims have survived. Whether or not the plaintiffs' have any state law claims against the defendants predicted upon the paper ballot issue, this Court has conclusively ruled that they have established no federal claim.

The federal claim regarding the appointment of Republican and Democratic election commissioners, however, does not arise from the same "nucleus of operative facts" as the state law claims relating to

---

**14.** The first and fourth claims, which seek relief under the Election Law, have already been dismissed as moot, because they sought relief only as to an election that has occurred.

The eighth and ninth claims seek relief under provisions of the New York State Constitution.

the mechanical aspects of conducting the primary. The former claim concerns the composition of the Board and the nature, extent and intention of alleged infringements of the voting rights of Green Party members. In contrast, the latter concerns the mechanisms for conducting primaries and turns almost exclusively upon interpretations of both the statute under which the defendants believed they were authorized to conduct the Green Party primary on paper ballots and provisions of the New York State Constitution. Thus, even if the tenth claim survived the motion for summary judgment, since the non-moot state claims do not arise from a common nucleus of operative fact with the surviving federal claim, this Court would not have supplemental jurisdiction over the plaintiffs' state constitutional claims.

Even if supplemental jurisdiction did exist here, moreover, the Court would still exercise its discretion to decline to exercise jurisdiction over the state-law claims. Section 1367(c) also permits courts to decline supplemental jurisdiction where "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). This provision encapsulates the concern that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. This is particularly the case where the issues raised in the state law claims concern the "administration of its government" and thus "principles of comity and federalism may dictate that these questions be left for decision by state courts." *Seabrook v. Jacobson*, 153 F.3d 70, 72 (1998).

This case raises precisely such strong comity concerns. Ordinarily, federal courts should be cautious about interpreting the extent of rights granted under state constitutions. In this case, those constitutional claims concern the meaning of state constitutional provisions guaranteeing voter secrecy and an equal and unrestricted right to vote, which go to the heart of the State's sovereignty—the mechanisms by which state officials will be chosen by the electorate. Moreover, resolving plaintiffs' state constitutional claims involves first assessing competing interpretations of the state Election Law provided by the parties. Plaintiffs have argued that the defendants' decision to conduct the Green Party primary on paper ballots was not authorized by state Election Law, and indeed that state law required the defendants to conduct all primary elections for public office on voting machines, while conducting all elections involving party officials on paper ballots, if there were insufficient machines to accommodate all parties. (Pl.Mem.5.) Defendants, of course, dispute this interpretation. New York's election laws are notoriously opaque, and the particular provisions contested here are awkwardly-drafted and susceptible to different interpretations. Thus, in order to resolve the state constitutional claims here, we would first have to answer difficult questions about the meaning of state statutes, and then, depending on the construction given, determine their consistency with the New York State Constitution. Assessing the validity under the state constitution of state election law seems a particularly inappropriate role for a federal court. If plaintiffs believe that New York officials have violated the state's own election laws and Constitution, they should present those claims to the state courts.

For these reasons, the remaining state-law claims (claims 8 and 9) are dismissed for lack of jurisdiction.[15]

15. Since plaintiffs have prevailed on none of their substantive claims, their claim for prevailing party attorneys' fees (claim 11) must be denied as well.

## IV. *Intervention*

The New York County Independence Committee and several of its members have moved to intervene in this case. The Federal Rules of Civil Procedure permits intervention of a party "upon timely application" when "an applicant's claim or defense and the main action have a question of law or fact in common." FED. R. CIV. P. 24(b). "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* The proposed complaint offered by the intervenors presents causes of action virtually identical to those brought by plaintiffs, which have been dismissed for the reasons set forth above. Consequently, the motion to intervene is denied as moot.

### Conclusion

For the reasons stated above, defendant Wilkey's motion to dismiss and plaintiffs' motion for summary judgment are denied. Defendants' motion to dismiss or for summary judgment are granted in that claims 1, 2, 4 and 5 are dismissed as moot; summary judgment is granted for defendants on claims 3, 6, 7, 10, and 11; and claims 8 and 9 are dismissed for lack of jurisdiction. The motion to intervene is denied.

SO ORDERED.